428 So.2d 1320 (1983)
George J. CAMATSOS, Appellee-Appellant,
v.
The AETNA CASUALTY & SURETY COMPANY, et al., Appellants-Appellees.
No. 82-641.
Court of Appeal of Louisiana, Third Circuit.
March 9, 1983.
*1321 Gold, Little, Simon, Weems & Bruser, Eugene J. Sues, Alexandria, for defendants-appellants-appellees.
Fuhrer & Flournoy, Leonard Fuhrer, Alexandria, for defendant-appellee-appellant.
Downs & Downs, James C. Downs, Alexandria, for plaintiff-appellee.
Gist, Methvin, Hughes & Munsterman, DeWitt T. Methvin, Jr., Alexandria, Michael D. Skarina, Aurora, Colo., for defendant-appellee.
Before CUTRER, FORET and KNOLL, JJ.
KNOLL, Judge.
This appeal arises from an award of damages for a wrongful death and personal injuries as a result of an automobile accident. Two suits were filed; Victor Camatsos v. Aetna Casualty and Surety Company et al., 428 So.2d 1372 a suit for the wrongful death of Steve Camatsos and the personal injuries he suffered; George Camatsos v. Aetna Casualty and Surety Company (hereafter referred to as Aetna), et al., a suit for the wrongful death of Steve Camatsos, the personal injuries Steve Camatsos suffered, and the personal injuries George Camatsos suffered as a result of the accident. The two suits were consolidated for trial. Initially, Aetna requested a trial by jury but subsequently waived the demand. The trial court awarded Dr. George Camatsos $59,500.00 for his personal injuries, $9,355.81 for his medical expenses, $35,000.00 for loss of income and $23,278.70 for his father's wrongful death, suffering, and funeral expenses. Thus, Dr. Camatsos's total award is $127,134.51. The trial court awarded Victor Camatsos $23,278.70 for his father's wrongful death, suffering, and funeral expenses. The trial court assigned written reasons for its judgment. We affirm.
*1322 The appellant, Aetna, urges: (1) the trial court erred in not finding George Camatsos guilty of independent contributory negligence; (2) the trial court erred in finding Toole liable in negligently entrusting the vehicle to Skarina; (3) the trial court erred in finding P & B Welding and Fabricating, Inc. vicariously liable, and (4) the trial court's award of damages was excessive. The appellees, George Camatsos and Victor Camatsos, answered the appeal contending the trial court's award of damages was inadequate.

FACTS
The accident occurred on Louisiana Highway # 28 when a tractor and trailer (18 wheeler) which was driven by Michael Skarina blocked both traffic lanes. Dr. George Camatsos's automobile struck the rear wheels of the trailer while passing another vehicle in a no passing zone.
The tractor and trailer are owned by P & B Welding and Fabricating, Inc. (hereafter referred to as P & B), a foreign corporation domiciled in Hope Hull, Alabama. The day preceding the accident Joe Toole, an employee of P & B, was instructed to deliver a load of steel to Fort Polk, Louisiana. Toole departed from Hope Hull at approximately 4:00 P.M. on December 30, 1980. He arrived at Fort Polk early the next morning.
Toole met Skarina, a soldier stationed at Fort Polk, around noon on December 31. Toole advised Skarina that he was uncertain as to the route he should take through Alexandria, Louisiana to return to Alabama. Skarina volunteered to assist Toole through Alexandria and proceed to lead him in his car. Somewhere between Fort Polk and Alexandria, Toole stopped his truck and offered Skarina a drink of whiskey. Skarina testified that he refused the drink and he was not sure if Toole took a drink.
After they reached Alexandria, Toole parked the truck (also referred to as rig) at the Rapides Parish Coliseum. They then proceeded to a liquor store in Skarina's car where each purchased a bottle of whiskey and returned to the parked rig. Toole allowed Skarina to drive the rig around the parking lot of the Coliseum.
Skarina advised Toole that he was going to a pig roast at a camp on Highway # 28 which was on Toole's route to Alabama. He invited Toole to stop at the camp to eat. Toole and Skarina got into Skarina's car at the intersection of Louisiana Highway # 28 and Stock Landing Road and drove to the camp. After they arrived at the camp, Toole gave Skarina the keys to the truck to bring it from the highway to the camp.
At Skarina's request, Toole allowed him to take the truck to Monterey, Louisiana to pick up Skarina's date. When Skarina arrived at Monterey his date was not home. Skarina, on his return to the camp, passed the intersection and drove to the Ryder Truck Stop where he could easily turn around. However, on the second attempt he passed the intersection again. Skarina decided to make a U-turn on the highway. When he attempted to do this the front wheels of the tractor went into the ditch and the back wheels became lodged against the trailer which caused the trailer to block the traveled portion of the highway in a perpendicular position. Further, the clearance lights on the side of the trailer were not illuminated. Skarina could not shift the truck into the proper power range to move it from the highway. Skarina left the truck to get help, and at approximately 7:30 P.M. the accident occurred with the Camatsos's automobile.

CAUSE OF THE ACCIDENT
The trial judge, in his well written reasons for judgment, found that the sole cause of the accident was the obstruction of the highway by the tractor trailer. He states:

"This court finds that the sole cause of the accident was the obstruction of the highway by the tractor-trailer. Although Dr. Camatsos passed another vehicle in a no passing zone prior to the collision, this action was not a contributing cause of the accident. The passing manuever had been nearly completed when Dr. Camatsos first saw the flat bed trailer extending *1323 across the highway. The tractor's cab lights on the left side of the road gave no indication that the virtually invisible trailer extended across the right side of the road. The risk thereby created by the tractor-trailer was not one which the statute prohibiting passing on a yellow line was intended to protect against. Therefore, Dr. Camatsos' passing manuever was not a cause of the collision, and he cannot be held negligent to any degree. Charles v. LaVergne, 412 So2d 726."

The purpose of the no-passing zone at the point of the accident is a protection against collisions with oncoming vehicles. The risk and harm encountered by the truck must fall within the scope of protection of the statute in order that the violation of the highway safety statute by Dr. Camatsos results in actionable contributory negligence. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298 (La. 1962); Beraud v. Allstate Insurance Company, 251 So.2d 402 (La.App. 1st Cir.1971); Charles v. LaVergne, 412 So.2d 726 (La. App. 3rd Cir.1982). The risk encountered by the defendants clearly does not fall within the scope of protection of the statute.

AETNA'S LIABILITY
Aetna's policy provides in part:
"We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto."
In the case of American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253 (La.1969), the Supreme Court noted when a named insured grants unrestricted permission to use an insured vehicle to another, the permittee is placed "in the position of the named insured clothed with all of his authority and rights under the policy." In American Home Company, supra, Jesse Waters, the named insured, gave broad permission to his son for the use of the car. The Court stated:
"Although Jesse G. Waters was the named insured, the permission and authority delegated by him to Randy for the use of the car was so broad and so free of restrictions that it may safely be said that Waters delegated Randy whatever authority he had to grant permission to others to drive the car."
P & B exercised little control over Toole during the course of his employment. The only instructions he was given were those he received orally when he was hired. Toole testified that he worked for P & B for approximately four years and he was never required to keep a log while he traveled. The permission and authority delegated by P & B to Toole for the use of the truck was broad and free from restrictions. Therefore, he was clothed with the authority and rights of the named insured.
It is clear that Toole was negligent when he allowed Skarina to use the truck to go to Monterey. Toole and Skarina were drinking before they arrived at the pig roast and they continued to drink while they were there. Toole knew or should have known that Skarina was intoxicated when he allowed him to use the truck. The jurisprudence is established:

"... [T]hat the owner of an automobile who knowingly entrusts it to an intoxicated, or otherwise incompetent, driver is responsible for the harm resulting from the incompetent operation of the vehicle." Danos v. St. Pierre, 383 So.2d 1019 (La. App. 1st Cir.1980).

The authority with which P & B clothed Toole renders his negligent entrustment of the truck a fault covered by the liability insurance policy. Nehrbass v. Home Indemnity Company, 37 F.Supp. 123 (W.D.La. 1941).
Aetna relies upon Smith v. Insurance Company of State of Pennsylvania, 161 So.2d 903 (La.App. 1st Cir.1964). The trial court examined the Smith case and the case at bar, and correctly determined:

"This Court is aware that Smith v. Insurance Company of State of Pennsylvania, 161 So.2d 903 is contrary to this holding. In Smith, there was a clear and definite *1324 policy that Poche was not to let anyone drive his vehicle as it was owned by the State of Louisiana. Poche allowed his son to use the vehicle and his son was involved in an accident. There was no allegation or evidence of negligent entrustment in Smith. In this case the Court is faced with a somewhat different situation. It is not negligence for someone to entrust their automobile to a known safe driver. But, here we have a situation where the employer should have exercised some control and supervision over its employee. Toole was hired to drive a large vehicle with little or no pre-employment background investigation. He was placed on the road with no specific instruction or supervision. He allowed a known incompetent and intoxicated driver to take the truck on a busy highway. Such conduct by both P & B and Toole clearly distinguishes this case from Smith. Although P & B had given Toole general instructions that there was to be no drinking when he was driving and that he was not to let anyone else drive the truck, these instructions were never reduced to writing and were only given to Toole when he was first employed."

P & B'S LIABILITY
The liability of P & B falls within the provisions of LSA-C.C. Art. 2320.
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed...."
In order to find P & B vicariously liable, it must be determined that Toole was in the course and scope of his employment. The particular circumstances of each case will determine whether an employee's conduct is within the scope and course of his employment. Miller v. Keating, 349 So.2d 265 (La.1977).
Toole's actions must have been "primarily employment rooted" and "reasonably incidental" to the performance of his duties. Lebrane v. Lewis, 292 So.2d 216 (La.1974); Weysham v. New Orleans Public Service, Inc., 385 So.2d 19 (La.App. 4th Cir. 1980) writ denied 392 So.2d 690 (La.1980). His conduct is reasonably incidental to the performance of his duties if it is "closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business." Weysham, supra; Heard v. Blakney, 415 So.2d 487 (La.App. 1st Cir.1982).
When Toole stopped at the campsite he was only a short distance from the route he would use to return to Alabama. He testified that the reason he stopped was to eat and rest before completing his trip. Although there were no instructions given to Toole as to the time and place he should eat or rest, it could have been reasonably anticipated by P & B that he would need to do so. If Toole had not stopped he would have driven approximately twenty-four continuous hours. The trial court's written reasons soundly noted:
"The primary issue to be determined at this point is whether Toole was in the course and scope of his employment when he allowed Skarina to drive the truck to Monterey. At that time and place he was only a short distance from the route which he would have used in returning to Alabama. One of the reasons he had stopped at the pig roast was to eat and rest before completing his trip home. While such action would not ordinarily be contemplated or condoned by his employer, the employer would expect Toole to eat and rest at some point on the return trip. P & B would not have anticipated that Toole would return the next day. To have instructed him to do so would mean that he would have driven in excess of 24 hours. Other than general instructions as to the time and place of delivery, Toole was left to his own discretion insofar as his activities were concerned in returning to Alabama."
Therefore, we find that Toole's conduct was reasonably incidental to the performance of his duties and within the course and scope of his employment.

*1325 AWARD OF DAMAGES
The trial court favored us with well considered reasons for its judgment. Its award of damages to Dr. George Camatsos and Victor Camatsos states:
"Dr. Camatsos testified that following the accident he recalls several teeth falling out of his mouth, and his having to pick them up and place them back in his mouth. He was taken to the emergency room at Cabrini Hospital. He was seen by Dr. Hollier who performed surgery on his mouth. The surgery consisted of wiring his jaw in order to repair fractured facial bones. During his four day stay in the hospital Dr. Camatsos was in extreme pain. Following his release from the hospital in Alexandria, Dr. Camatsos returned to his home in Natchez, Mississippi. During his recovery period at his home Dr. Camatsos suffered a great deal, particularly because of the fractured facial bones. His mouth was wired in a closed position for six weeks. During this period he could not eat solid foods, and was in constant pain. Dr. Camatsos also sustained a displaced fracture of the breast bone and a fracture of a wrist bone. These fractures were treated by immobilization. For approximately two weeks after the accident he could not move without considerable pain. During the second week in February Dr. Camatsos returned to his practice for a few hours per day in which he saw ten to fifteen patients. Prior to the accident he normally would treat forty to fifty patients per day. During the months of March and April Dr. Camatsos was able to treat 20-30 patients per day and in June he resumed his regular practice.

Dr. Camatsos' federal income tax returns show that his 1981 income amounted to the sum of $169,000.00. His income for the years 1975 thru 1980 varied from $280,000.00 in 1976 to $193,000 in 1980. Dr. Camatsos' accountant testified that in his opinion Dr. Camatsos' loss of income during the six months following the accident amounted to $64,141.00. If this figure is accepted as loss of income for the year 1981, Dr. Camatsos would have had a gross income of $233,000.00 for 1981. In 1980 his income was $193,000.00 and in 1979 his income was $204,000.00. There is no reason to suspect that Dr. Camatsos' income in 1981 would have been any greater than 1979. The Court therefore feels that an award of $35,000.00 for loss of income would fully compensate him for this item.

For the injuries sustained by Dr. Camatsos which consisted of:
1) Fracture of jaw, injury to teeth, fracture of orbital rim,
2) Fracture to wrist,
3) Fracture of sternum, dizziness, cuts and abrasions to face and body.
Dr. Camatsos is entitled to an award of $59,500.00 for his personal injuries.
Dr. Camatsos will in addition be awarded $9,355.81 for his medical expenses.
Mr. Steve Camatsos a guest passenger in Dr. Camatsos automobile at the time of the accident survived for approximately four hours. The testimony indicates that during most of this time Mr. Camatsos was conscious and in pain. Mr. Camatsos who was 87 at the time of his death had apparently been in good health prior to the accident. The Court will award the sum of $10,000.00 for the conscious pain and suffering of Mr. Steve Camatsos. Although Mr. Steve Camatsos had no children of his own he legally adopted George Camatsos and Victor Camatsos. The evidence shows that Steve enjoyed a close relationship with both of his adoptive children. They went on trips together and often visited in each others home. The parties were extremely close and his two sons suffered a great personal loss as a result of the death of their father. The Court feels that an award of $15,000 to each of the plaintiffs is justified."
The Camatsoses asked for $8,661.10 for funeral expenses for their father. We find that the trial court did not commit manifest error in granting $4,500.00 funeral expenses for Mr. Steve Camatsos.
In view of the much discretion allowed the trier of fact in compensating for damages, *1326 we find no manifest error in the awards. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For the reasons assigned, the judgment of the trial court is affirmed, casting appellants, P & B Welding and Fabricating, Inc. and Aetna Casualty and Surety Company, for costs of this appeal.
AFFIRMED.