FORET, Judge.
Jack W. Brown (plaintiff) brought this action to recover the sum of $22,613.50, representing the amount allegedly due him under the terms of a sub-contract, damages to his reputation, and attorney’s fees. Named defendants are St. Jules Catholic Church[1] and Delegal Construction Corporation. In turn, defendants filed an answer and reconventional demand in which they sought to recover the sum of $49,734.81: for damage to a mobile home and its contents; expenses incurred in providing supervisors to oversee plaintiff’s employees’ work; the cost of correcting construction defects; the cost of replacing a roof; damage to their reputation; and, expenses incurred in bonding out a lien filed by plaintiff.
After trial on the merits, the trial court rendered judgment in favor of plaintiff on the main demand, awarding him the sum of $12,804.42, together with legal interest thereon. The trial court further rendered judgment in favor of defendants on the reconventional demand, awarding them the sum of $8,980.81, together with legal interest thereon.
Plaintiff appeals and raises the following issues:
(1) Whether the trial court committed manifest error in finding that plaintiff’s employees had damaged the mobile home in question, and that plaintiff was liable for said damage.
(2) Whether the trial court committed manifest error in finding the exist *1254 ence of construction defects in the work done by plaintiffs employees, and in assessing the costs of repairing said defects.
(3) Whether the trial court erred in allowing the introduction of certain alleged hearsay evidence by defendants to prove certain charges deducted from the sum paid plaintiff under the terms of the sub-contract.
FACTS
On April 17, 1979, a contract was entered into between St. Jules Apartments for Retired & Senior Citizens, Inc. (as owner) and Delegal Construction Corporation (as contractor) for the construction of an apartment complex (the project) in Franklin. Thereafter, Delegal and plaintiff entered into a sub-contract which provided that plaintiff would furnish the labor to: construct the slab for the buildings; erect the walls and roof; install the windows; hang the sheetrock; place the interior and exteri- or trim; and, install the cabinets therein. The sub-contract specifically stated that the construction of sidewalks and parking pads were excluded therefrom, as was the mechanical work, electrical work, bricklaying, and cement finishing. The sub-contract further provided that the contractor, Delegal, would handle plaintiff’s payroll, and that workmen’s compensation insurance, old age benefits, and unemployment compensation taxes were to be paid by plaintiff. The total amount of the sub-contract was $88,080.00, including payroll and expenses.
Shortly after the sub-contract was entered into, plaintiff provided the labor, and Delegal provided the materials, for construction on the project to begin. The project was being financed by the Farmers Home Administration (FHA), which conducted periodic inspections of the project to insure that the appropriate construction standards of that entity were being met. Almost immediately, the parties began to run into problems with the FHA inspectors regarding sub-standard construction work on the project. In order to correct these problems, certain portions of the project had to be torn down and reconstructed to
meet FHA standards. Finally, the project was completed and accepted by the FHA.
Problems arose between the parties when DelegaF made the last payment to plaintiff under the terms of the sub-contract. Apparently, Delegal deducted the cost of correcting the defective construction work performed by plaintiff’s employees from the amount it was supposed to pay plaintiff. As a result, plaintiff filed the instant suit. Defendants answered and filed a reconventional demand in which they sought to recover, among other things, damages for the destruction of a mobile home that had been placed at the construction site for use by plaintiff’s employees as required by the sub-contract.
DAMAGES TO THE MOBILE HOME
Plaintiff contends that the trial court committed manifest error in finding that his employees damaged the mobile home. Plaintiff further contends that, even if his employees did damage it, the trial court erred in finding that he was legally responsible for said damage. Finally, plaintiff argues that the trial court erred in awarding defendants $4,000 for damage to the mobile home as they failed to prove the amount of said damage.
Joseph C. Delegal, Jr. testified that the mobile home had been purchased from a dealer in Opelousas for $4,900. At the time of trial, the mobile home was sitting in a field near Milton, where it had been junked. A number of witnesses testified that the mobile home was clean and in very good condition when it was placed at the construction site. Apparently, some of plaintiff’s employees did not live in Franklin, and the mobile home had been provided for them to stay in while working on the project. However, shortly after they moved into it, the condition of the trailer began to deteriorate to the point where it was no longer fit for human habitation. There was testimony indicating that: appliances were intentionally damaged; garbage was swept into the floor-mounted air conditioning ducts; walls and doors had objects driven through them; bathroom fa *1255 cilities were broken beyond repair; and, that dirt and filth were allowed to accumulate throughout the mobile home.
James Wells was one of plaintiff’s employees who stayed in the mobile home. He admitted that he broke a copper water line leading to the toilet in order to prevent it from being used because it had become clogged up. He further admitted that another of plaintiff’s employees had found a dog sleeping on a bed, and that this employee picked the dog up and hurled it against a mirror with such force that the mirror broke and a piece of glass stuck in the dog’s back. Wells also testified that plaintiff’s employees had swept garbage into the air conditioning ducts. This was the only direct evidence regarding damage done to the mobile home by plaintiff’s employees. However, Wells stated that one of plaintiff’s employees consumed large amounts of alcohol while staying in the mobile home, and that it was common practice for plaintiff’s other employees to also consume alcohol while staying there. Finally, and most revealing, Wells testified that:
“We’d give duties to everybody down there in the trailer. They’d keep it up for a day or so, but that’d be it. You know, like washing dishes and all. But what can you expect with all them men in the trailer. I mean, there’s nothing to do, away from home. You know, it’s like doing this on a desk. (Witness indicated by tapping fingers on desk.) Breaking a pencil from tension, and stuff like that.”
Wells did testify that the mobile home had been broken into a number of times on weekends and that food had been strewn about. However, the damage was apparently slight as plaintiff’s employees were able to clean it up each time. Finally, the evidence clearly shows that plaintiff’s employees were the only persons living in the mobile home, although other persons would use the restroom facilities and the telephone on occasion.
We agree with the trial court’s finding that the damage to the mobile home was caused to a large extent by plaintiff’s employees.
Plaintiff next argues that, even if his employees damaged the mobile home, he is not responsible for it. It is his position that he employed carpenters to do carpentry work, and that they were not acting in the course and scope of their employment, or in the exercise of the functions in which they were employed, when they intentionally damaged the mobile home.
LSA-C.C. Article 2320 provides:
“Art. 2320. Acts of servants, students or apprentices
Art. 2320. Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.”
In order to find plaintiff vicariously liable for the damage caused by his employees, it must be determined that they were in the course and scope of their employment. The particular circumstances of each case will determine whether an employee’s conduct is within the course and scope of his employment. Camatsos v. Aetna Casualty & Surety Company, 428 So.2d 1320 (La.App. 3 Cir.1983); Miller v. Keating, 349 So.2d 265 (La.1977).
Plaintiff’s employees’ actions must have been “primarily employment rooted” and “reasonably incidental” to the performance of their duties. Camatsos v. Aetna Casualty & Surety Company, supra; LeBrane v. Lewis, 292 So.2d 216 (La.1974); Weysham v. New Orleans Public Service, Inc., 385 So.2d 19 (La.App. 4 Cir.1980), writ denied, 392 So.2d 690 (La.1980). Their conduct is reasonably incidental to the performance of their duties if it is closely connected in time, place and causation to their employment duties as to be regarded as a risk of harm fairly attributa *1256 ble to their employer’s business. Camatsos v. Aetna Casualty & Surety Company, supra; Weysham v. New Orleans Public Service, Inc., supra; Heard v. Blakney, 415 So.2d 487 (La.App. 1 Cir.1982).
Plaintiffs employees occupied the mobile home because plaintiffs business required them to work at a location that was some distance from their homes. The mobile home provided a place for plaintiffs employees to live while they were performing their employment duties.' In addition, the sub-contract required Delegal to provide a mobile home for plaintiffs employees.
It is our opinion that plaintiffs employees’ conduct was reasonably incidental to the performance of their duties and within the course and scope of their employment.
Finally, plaintiff argues that defendants failed to prove the amount of damages sustained by the mobile home. As noted above, the initial cost of the mobile home was $4,900. There was some evidence indicating that Joseph C. Delegal, III had the mobile home cleaned for use as an office after plaintiff’s employees were no longer living there. Apparently, it was used as such for a short while and then junked because of the severe damage it had sustained.
It is axiomatic that when there is a legal right to recovery of damages but the amount cannot be exactly estimated, the courts have reasonable discretion to assess damages based upon all the facts and circumstances of the particular case. Emerson v. Empire Fire & Marine Insurance Co., 393 So.2d 691 (La.1981); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Coleman v. Victor, 326 So.2d 344 (La.1976). If it is practical to repair the damaged property, the objective of restoring the injured party to his prior position may be achieved by awarding him the difference in the value of the property before the damage was inflicted and immediately afterwards. If this figure cannot be determined with a reasonable degree of certainty, the damage award should be based upon cost to replace the damaged property, less a depreciation factor. Petrol Industries, Inc. v. Gearhart-Owen Industries, Inc., 424 So.2d 1059 (La.App. 2 Cir.1982).
It is apparent that the trial court’s award of $4,000 to defendants for damages to the mobile home was based upon the cost to replace the mobile home (as it was not practical to repair it), less a depreciation factor. We do not consider this award to be an abuse of the trial court’s reasonable discretion to assess such damages.
AWARD FOR CONSTRUCTION DEFECTS
Plaintiff contends that the trial court erred in awarding defendants $4,130.81 for correction of defects in the construction work performed by his employees, and $850 for repair of an improperly constructed roof. He argues that defendants failed to prove the existence of said defects, by whom they were caused, or the cost of repairing them. He further argues that defendants made no objections regarding these alleged defects until after suit was filed and, therefore, they should be held to have accepted the alleged defects.
The record shows that defendants produced numerous witnesses who testified to the existence of defects in the construction work performed by plaintiff’s employees. Joseph Delegal, III testified that most of the walls in the buildings were out of square, and that he and his men had to go back in and straighten them up. Also, moldings had to be placed on the outside of the buildings because joints wouldn’t fit together, and “Deadwood” had to be placed on the walls so that sheetrock could be hung there. Plaintiff’s employees forgot to put this “Deadwood” on the walls. Mr. Delegal went on to testify that numerous problems were encountered with the bathrooms in the apartments. Doors were placed in the wrong place so that they struck the toilets when opened. There were also problems encountered in placing the bathtubs in the bathrooms because plaintiff’s employees had constructed the spaces in which they were to be placed using dimensions other than those called *1257 for in the building specifications. Also, the building plans called for cabinets to be screwed to the walls. Instead, plaintiffs employees nailed them to the walls. The list of defects, testified to by the witnesses, goes on, but we see no need to repeat them all. It is apparent that these defects were caused by the poor workmanship of plaintiffs employees.
The fact that the defects were caused by plaintiffs employees is best illustrated by the testimony of James Wells (who was acting as a supervisor for plaintiff at the project) found in the following exchange between himself and defense counsel:
“Q. The carpenters that were working under you in your crew, were they skilled carpenters?
A. I don’t know.
Q. Were they good carpenters?
A. No, I can’t say that they were.
Q. And why not?
A. Lack of experience.”
As to the cost of correcting the construction defects, Joseph C. Delegal, Jr. testified that it amounted to $4,130.81 for labor alone to bring the buildings to the point where the FHA would accept them. He explained that, in the beginning, he was the one who paid for correcting the defects, but that he soon decided that plaintiff should pay for these. At this time, he instructed his bookkeeper and supervisors to be very careful in keeping records of what was being expended to correct the defects. He further instructed them that if there was any question as to whether an item should be charged for the correction of a defect, then Delegal Construction Corporation would pay for it.
Josette Abshire, the bookkeeper for Del-egal Construction Corporation, explained in detail the method by which charges attributable to the correction of the construction defects were posted in the company’s records. These records were introduced in evidence. Mrs. Abshire stated that the cost of correcting the construction defects could be determined from examining these records.
We agree with the trial court’s finding that defendants have proven, by a preponderance of the evidence, the cost of correcting the construction defects caused by plaintiff’s employees. As for the $850 awarded defendants by the trial court for repairs to the roof, plaintiff admitted that this work was necessary and that he authorized defendants to hire people to do it. In the trial court, he stated that he had no dispute with the amounts that were paid to these people for their work.
Finally, plaintiff argues that where a party is aware of, but makes no objections to, alleged defects until after suit has been filed, he will be held to have accepted the alleged defects. He cites Lane Wilson Company, Inc. v. Gregory, 322 So.2d 369 (La.App. 2 Cir.1975), in support of his argument.
The evidence clearly shows that defendants objected many times to the fact that plaintiff’s employees were performing sub-standard construction work on the project prior to suit being filed. Joseph Delegal, Jr. testified that he sometimes contacted plaintiff as many as three times a week by telephone in an attempt to get him to come to the construction site to supervise his employees. However, he was unable to persuade plaintiff to do so. Mr. Delegal stated that he spoke with plaintiff on the telephone approximately ten times regarding problems they were experiencing with the roof. Finally, Mr. Delegal withheld $1,000 from the last payment made to plaintiff under the sub-contract to pay for correction of the defective construction work. Thus, there is no merit to plaintiff’s argument that defendants failed to object to the defects until after suit was filed.
ADDITION OF 19.27% TO GROSS PAYROLL
The sub-contract entered into by plaintiff and Delegal Construction Corporation provided that plaintiff would be paid $88,080, less “payrolls and expenses”. Delegal would handle the payroll for plaintiff. However, plaintiff was to pay workmen’s compensation insurance, old age benefits, *1258 and unemployment compensation taxes. Joseph Delegal, Jr. testified that he was the one who computed the rate of 19.27% of gross payroll that was deducted from the sum plaintiff received under the subcontract. He stated that the 19.27% rate was arrived at by taking certain figures from a form sent to him by the “government” each year and adding these figures to those contained in an insurance policy. This additional deduction from the sub-contract price was to cover workmen’s compensation, old age benefits, and unemployment compensation taxes.
Plaintiff objected to the introduction of this testimony as being hearsay because the accountant and insurance agent with whom Joseph Delegal, Jr. conferred in arriving at this figure did not testify. The trial court overruled plaintiff’s objection.
We see no need for deciding the issue of whether the trial court erred in overruling plaintiff’s objection. Plaintiff is the one who is alleging that the 19.27% (of gross payroll) rate used by defendants is incorrect. Thus, plaintiff had the burden of proving this. Plaintiff could have done this through the use of discovery procedures, and by calling Delegal Construction Corporation’s accountant as a witness. This he failed to do.
It is our opinion that plaintiff failed to prove that defendants erred in calculating the rate used to cover his obligations under the terms of the sub-contract.
DECREE
For the above and foregoing reasons, the judgment of the trial court is affirmed.
All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.

. Apparently, St. Jules Catholic Church was made a defendant to this action because it is the owner of the apartment complex which was constructed by Delegal Construction Corporation. However, it has not taken an appeal from the trial court’s judgment, nor has it answered plaintiff s appeal. In addition,it is not named as an appellee to this appeal. Thus, the term “defendants”, used throughout this opinion, will usually refer to Delegal Construction Corporation alone.