295 So.2d 29 (1974)
Mrs. Noflet R. MURPHY, Plaintiff-Appellant,
v.
ALLSTATE INSURANCE COMPANY et al., Defendants-Appellees.
No. 12295.
Court of Appeal of Louisiana, Second Circuit.
April 23, 1974.
Rehearing Denied May 28, 1974.
Writ Refused September 13, 1974.
*30 Campbell, Campbell, Marvin & Johnson by John T. Campbell, Minden, for plaintiff-appellant.
Mayer & Smith by Paul R. Mayer, Shreveport, for Nursecare and St. Paul Fire & Marine Ins. Co., defendants-appellants.
Roland J. Achee, Shreveport, for Timothy P. Lynch and Allstate Ins. Co.
Before AYRES, PRICE and HALL, JJ.
En Banc. Rehearing Denied May 28, 1974.
PRICE, Judge.
Plaintiff's husband, Howard J. Murphy, was struck by an automobile and killed while standing or walking in the inside lane for eastbound traffic on U. S. Highway 80 just east of Bossier City at approximately 9:00 p. m. on September 7, 1971. The driver of the automobile was Timothy P. Lynch, whose liability insurer is Allstate Insurance Company. At the time of the accident, Mr. Murphy was a 74-year old man in an advanced state of senility, who was a patient at Nursecare of Shreveport, Inc., a private nursing home located on Irving Place. His widow, Mrs. Noflet R. Murphy, brought this action seeking damages for burial expenses, grief and loss of support occasioned by the death of her husband. Defendants named are Lynch, Allstate, Nursecare, and its liability insurer, St. Paul Fire and Marine Insurance Company.
Plaintiff contends the combined actions of Lynch and Nursecare caused the death of Murphy. The actions of Lynch alleged to constitute negligence on his part proximately causing his death are:
(a) He was not keeping a proper lookout.
(b) He should have seen, and in law did see, the decedent in a sufficient time and at a sufficient distance to have avoided the collision, and failed to do so.
(c) He was driving at an excessive rate of speed under the circumstances then and there prevailing.
(d) He discovered, or had he been properly observant, would have discovered, the perilous situation in which decedent was in time to have taken preventive measures to avoid striking him, and he failed to take such measures.
(e) He had the last clear chance to have avoided the collision and its consequences and he did not avail himself of that opportunity.
Plaintiff contends Nursecare is liable for breach of contract and in tort for the following acts or omissions having a causal relation to Murphy's death:
(a) In failing to provide adequate attendants and supervision to prevent the decedent's escaping from the Nursing *31 Center, notwithstanding the fact that they had been warned that such an escape might be attempted.
(b) In breaching its agreement with petitioner to watch after and care for decedent so as to insure his safety.
(c) In permitting him to escape unnoticed from the Nursing Center.
Each defendant answered, denying any negligence causing the death of Murphy and each alternatively plead contributory negligence on the part of the decedent in walking in the traveled portion of the highway at night, and further alleged plaintiff, Mrs. Murphy, was guilty of contributory negligence in not having her husband committed to an institution where he could have been detained against his will in view of the mental condition she knew he was in.
After trial on the merits, the district court rejected plaintiff's demands as against Lynch and his insurer on finding an absence of negligence on his part. The court found Nursecare accepted Murphy as a patient, knowing of his senile condition and need for close supervision, and was negligent in not taking proper steps to prevent his leaving the institution unattended. The court awarded plaintiff judgment against Nursecare and its insurer, St. Paul, in the sum of $26,630.
Defendants, Nursecare and St. Paul, have suspensively appealed from the judgment, taking issue with the trial court's finding of liability on the part of Nursecare.
Plaintiff, Mrs. Noflet Murphy, devolutively appealed, requesting the judgment of the trial court be amended to hold Lynch and his insurer liable in solido with Nursecare, and to increase the award for damages.
After the filing of the transcript of appeal in this court Mrs. Noflet Murphy died and her daughter, Mrs. Sarah G. Ballenger, was substituted as party plaintiff.
For reasons given hereinafter, we affirm the judgment rejecting the demands against Lynch and Allstate, and reverse the judgment in favor of plaintiff against Nursecare and St. Paul.
The two areas for review on this appeal relate to the circumstances surrounding the collision of Lynch's automobile with decedent and any liability flowing therefrom, and the alleged breach of the duty of care owed by Nursecare in allowing deceased to leave its premises unattended.
We shall first consider the correctness of the trial court's determination Lynch was free of negligence. The trial judge absolved Lynch of any negligence causing Murphy's death for the following reasons:
"Mr. Murphy was next and last seen alive about 9:00 P.M. standing in U. S. Highway 80 near the center of the inside of the two eastbound traffic lanes of said highway by Mr. Timothy P. Lynch, who was driving his 1969 two door Plymouth automobile from his work at Sears Store in Shreveport to his home in Haughton, Louisiana, at a rate of speed of approximately 65 miles an hour with his headlights on low beam and in the inside or northernmost of the two eastbound traffic lanes. When Mr. Lynch saw Mr. Murphy standing in the highway, he pulled his car to the left and applied his brakes forcibly, but was unable to stop and struck Mr. Murphy in such a manner as to cause his body to be thrown over the vehicle and the legs severed from the torso, apparently killing him almost instantly.
"Mr. Lynch testified that traffic on the highway that evening was almost continuous westbound as this was a peak traffic period for the highway. Mr. Lynch estimated that he was some 250 feet from Mr. Murphy when he first observed him standing in the center of the road. He further stated that he had just passed several cars and that to the best of his recollection there were no cars ahead of him in either eastbound lane of *32 traffic. He further stated that Mr. Murphy stepped to the north as he (Lynch) attempted to go to the left of him on the shoulder and, in his opinion, he would have been able to miss him had Mr. Murphy stayed still where he was.
"It was also settled that the night was very dark, the road was flat, level, and straight at the scene, that said road surface was dry concrete, and there were no obstructions in the highway to block the vision of anyone coming from the west towards where Mr. Murphy was struck.
"The chief disputed fact is which lane of the two eastbound lanes Mr. Lynch was traveling in immediately prior to impact and where the impact took place. Actually neither of these facts are essential to determination of the liability of Mr. Lynch and his insurer in this Court's opinion."
* * * * * *
"Plaintiff's counsel argued strenuously that Lynch was negligent in driving with his headlights on low beam for the reason that the law requires that they be on high beam while driving on the open road. The short answer to this is that Mr. Lynch testified that traffic oncoming toward the west was almost continuous, that he was driving with his lights on low beam to avoid blinding that traffic, and this was corroborated by the State Trooper. This Court finds that that was proper action under the circumstances and not negligence.
"Even with his lights dim Mr. Lynch testified that he saw the decedent in the highway an estimated 250 feet ahead of him, which means that his low beam illuminated the highway at least 100 feet more than required by the statutes (L.R. S. 32:321). Accepting Mr. Lynch's estimate of the distance between him and Mr. Murphy when he first saw him in the highway, the question is whether he could have stopped the vehicle at the speed which he was traveling before striking the decedent or should have taken other evasive action under the circumstances. Trooper Hollis measured 240 feet of skid marks made by the Lynch vehicle.
"Professor Joseph H. Barnwell of Louisiana Tech, accepted by the Court as an expert electrical engineer and mechanical engineer and an auto accident analyst, testified that at 65 miles per hour a vehicle travels 95 feet per second and 72 feet in three-quarters of a second. He further testified that it takes the average individual three-quarters of a second for perception and three-quarters of a second for reaction or a total of 144 feet before applying the brakes (at 65 miles per hour) and that the actual braking distance on Highway 80 at the point of the accident would be 254 feet at that speed, or a total of 398 feet. Professor Barnwell also testified that assuming 240 feet of total skid marks, the Lynch vehicle was traveling 65.4 miles per hour before braking. If the time allowed for perception is eliminated and only the three-quarter second reaction time included, it would have taken 326 feet at 65 miles per hour to stop the Lynch vehicle, according to Professor Barnwell. Since Professor Barnwell was the only expert who testified on this question, the Court will accept his figures over the Blashfield's stopping chart, which was admitted into evidence over strenuous objection, and finds that it would have been a physical impossibility for Mr. Lynch to have stopped his vehicle before striking Mr. Murphy standing in the highway.
"The other negligence on Mr. Lynch's part urged by the counsel for plaintiff is that he veered his car to the left when if Mr. Murphy was standing in the left lane of the eastbound lanes he could have driven to the right and missed him completely. The obvious answer to this contention is that Mr. Lynch cannot be held to the same degree of care when he sees a man standing in the middle of this *33 busy highway at night as he would under other circumstances and had a time for calm reflection. This was definitely an emergency situation and his testimony was that he thought he could miss him by turning to the left and going around him in that manner but that Mr. Murphy stepped in front of his car at the last moment. * * *"
Plaintiff contends the trial court erred in refusing to hold Lynch negligent for driving at night with his lights on low beam in violation of the Highway Regulatory Statute, and for failing to see the decedent in sufficient time to have taken appropriate evasive action to avoid striking him.
The jurisprudence no longer attributes negligence as a matter of law to a motorist who fails to avoid striking an object in the road solely on the basis of the statute fixing a minimum range of headlights for night driving (LSA-R.S. 32:301-32:321). Craker v. Allstate Insurance Co., 259 La. 578, 250 So.2d 746 (1971). Nor is a motorist negligent for driving with his lights on low beam at night where because of heavy traffic it would not be reasonable to have them on high beam. Byrd v. Elliott, 108 So.2d 248 (La.App. 2d Cir. 1958).
Even prior to the Craker decision, the jurisprudence absolved motorists from negligence in striking pedestrians at night where their presence in the roadway was unusual and unexpected. Calais v. Thibodeaux, 220 So.2d 209 (La.App. 3rd Cir. 1969), and cases cited therein.
We find no error of law or manifest error in the factual conclusions of the trial judge in absolving Lynch of negligence under the circumstances confronting him. It is apparent from the evidence he was driving within the speed limit on a multilane highway designed for a fast flow of traffic and was reasonable in driving with headlights on low beam due to heavy traffic conditions. Decedent's sudden appearance in the roadway was unusual and unexpected and created a sudden emergency to which Lynch reacted as a reasonable person in attempting to avoid the collision. Whether he could have succeeded by swerving the opposite direction is not the appropriate criteria. It is elementary that one confronted with a sudden emergency is not negligent solely on the basis of having selected an evasive maneuver which proved unsuccessful when after subsequent careful deliberation it appears there may have been a better course of action available.
Nor do the circumstances of this case lend themselves to the application of the doctrine of discovered peril as advanced by plaintiff in the alternative. There is no showing Lynch saw, or should have seen, decedent's plight at such a time he could have avoided striking him.
We shall next direct our attention to the liability of Nursecare for its alleged dereliction of duty in allowing Murphy to leave unattended.
Mrs. Murphy had married decedent in 1962 and the couple lived in Minden. The senility of decedent began two years prior to the accident resulting from hardening of the arteries and lack of circulation of blood to the brain. The condition had progressed just prior to the accident to the extent that decedent had the mental capacity of between a three to five year old child. According to the testimony of Mrs. Murphy, he had begun to leave the residence without her knowledge and she had been called to come get him by persons whose home he had gone to. She admitted him to a private nursing home in Minden, but after a period of two days the home advised her they were not equipped to care for him and he returned home. Mrs. Murphy saw an announcement in the newspaper of the opening of a new nursing home in Shreveport by Nursecare and consulted the director of the home about admitting her husband. There is some dispute as to how completely Mrs. Murphy described his propensity to slip away from *34 those caring for him. It is futher disputed as to the degree of assurance given by the director to Mrs. Murphy she could rely on the institution affording adequate care to prevent Murphy from slipping away.
Nevertheless, Mrs. Murphy brought her husband to Nursecare and admitted him on September 3, 1971. He somehow left unnoticed at around 5:00 p. m. on September 7th and mysteriously appeared some four hours later a number of miles away on U. S. Highway 80 headed toward Minden, at which time he was struck and killed as described previously.
The trial judge in his reasons for judgment found negligence on the part of Nursecare for accepting decedent as a patient with the knowledge of his condition and propensity to run away and then permitting him to walk away unattended on the night in question. The trial court's evaluation of burden of proof is stated thusly:
"The court cannot agree with counsel that plaintiff is required to prove exactly how Nursecare was negligent under these circumstances. It is sufficient that Mr. Murphy was permitted to leave the home unattended. Having failed to take whatever precautions were required to prevent his leaving the building unattended, this court finds that Nursecare Nursing Center was negligent and that what did happen to Mr. Murphy on that night was just what could have been expected to happen."
We interpret the trial judge's rationale to make Nursecare an absolute guarantor of the safety of the decedent as its patient, which is contrary to the prevailing jurisprudence. In the case of Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3rd Cir. 1971), involving somewhat analogous circumstances, the court set forth the general rules of care owed by nursing homes in this state as follows:
"A nursing home is not the insurer of the safety of its patients. The nursing home does have a duty to provide a reasonable standard of care, taking into consideration the patient's mental and physical condition. This duty owed does not include having a nurse or attendant following the patient around at all times. LeBlanc v. Midland National Insurance Company, 219 So.2d 251 (La.App. 3 Cir. 1969); and Tait v. Western World Insurance Company, 220 So.2d 226 (La. App. 3 Cir. 1969).
"It is clearly shown that the nursing home was in full compliance with all the requirements for the minimum standards for nursing homes by the State of Louisiana. On the date of the accident, the rest home had 64 patients, with a total of 19 employees providing 150 hours of nursing care for each 24-hour period. According to standards required, only 128 hours of nursing care was actually required; but in this instance, the Green Acres Rest Home was giving more than was required. The deceased was seen in his room at about 2:45 and at about 2:55 P.M. The latter time was approximately five minutes before the shift changed at 3:00 P.M. He was discovered missing shortly after 3:00 P.M. by the attendant who came on at 3:00 P.M., and was immediately reported missing. The deceased had apparently left his room and gone for a walk. He was found shortly after 3:00 P.M., and efforts were made for at least twenty minutes to revive him.
"Regulations prohibited locking of exits because of the necessity of fire escape routes, and the rest home had no authority to physically restrain patients. Patients could only be restrained by doctor's orders."
There is no presumption of negligence on the part of the institution merely because of the injury to a patient and the doctrine of res ipsa loquitur is inapplicable to this type situation. Tait v. Western World Insurance Company, 220 So.2d 226 (La.App. 3rd Cir. 1969). The same general rules apply to nursing homes as hospitals *35 in defining the degree of care owed to patients. After showing it has provided reasonable care for the safety and well being of its patient under the circumstances presented, a nursing home is not liable for injury caused by an untoward event unless it has breached a contractual agreement to furnish special care beyond that usually furnished which relates to the injury giving rise to the cause sued on. See Clarke v. Gowen Sanatorium, Inc., 160 So.2d 426 (La.App. 2nd Cir. 1964).
We do not take issue with the trial judge's finding the personnel of Nursecare were aware that Murphy was suffering from senile dementia and needed close observation. However, we do not find the evidence to show that Mrs. Murphy had disclosed she had previously placed him with another nursing home in Minden and he was removed at their request. Nor does the testimony of Mrs. Murphy disclose she related to Mrs. Newman any specific episodes of decedent having left the residence in Minden. She testified more to the effect he needed to be watched very closely because of his condition.
The medical history form signed and prepared by decedent's personal physician in connection with his admission to the home contained no instructions from the doctor on special care other than to see that the patient did not injure himself and should be attended by another person when leaving the premises. The doctor diagnosed Murphy as being ambulatory, which indicates he should be allowed to go from his room to the dining room and other recreational or social areas of the institution.
Mrs. Murphy admitted in her testimony she fully understood that the facilities of Nursecare did not include an attendant or nurse to every patient.
The evidence shows the nursing home was a new institution that had only been opened for a few days and that at the time of the incident had more personnel for the total number of patients then residing there than required by the statute regulating the requirements for such institutions, LSA-R.S. 40:2009.4. The Nursecare home is described as having three floors in use at the time decedent was admitted. The first floor contained a reception area, cafeteria or dining room, kitchen, social room, therapeutic treatment area, chapel, and office space. The second and third floors housed patients. A self service elevator provided access to the upper floors as well as two flights of stairs to comply with fire codes.
Murphy was assigned a room on the third floor immediately across from the Nurses' stand. Mrs. Newman testified this location was selected so he could be watched closely because of his senility. The hospital records and testimony of Nursecare personnel show decedent had gone downstairs to at least two meals each day after he was admitted. On other occasions he had gone downstairs to the lobby to get soft drinks, and at times was assisted back to his room by attendants.
On one occasion during this five-day period, Mrs. Newman encountered Murphy near the front door and took him for a walk outside the building. On the day of Murphy's unexplained disappearance, the nurse in charge of the afternoon shift on the third floor, Mrs. Carlisle, noticed Murphy around 4:20 p. m. when he requested use of the telephone. She again saw him just prior to five o'clock standing in the hall between the nurses' station and the elevator. Some of the other ambulatory patients were awaiting the elevator to go down to the evening meal at this time. At this moment Mrs. Carlisle received an emergency call from the room of another patient, who was choking, and hurried to this room to give assistance. She was away for approximately fifteen minutes from her station. When she returned she noticed Murphy was no longer in the hall. Other personnel on this floor were busily engaged in serving trays to the nonambulatory patients at this time. She assumed Murphy had gone down to the dining room with the others for this meal. She immediately *36 went down to the cafeteria to check and on not finding him there notified several of the attendants to begin a search for him. When he could not be found on the premises, the director, Mrs. Newman, was called and police authorities were notified to watch for him in Shreveport and Bossier City. Several of the personnel used their personal automobiles to immediately search the vicinity. These efforts proved to be in vain.
There is no explanation of how Murphy left the premises undetected. There are six exit doors on the ground level and a secretary-receptionist is situated in the main lobby with a view of the elevator doors and the main front entrance lobby.
The testimony of the several witnesses for Nursecare indicates proper notice was given to all personnel of decedent's condition and adequate attention was given for his needs except for the brief interval of some fifteen minutes when he disappeared without being detected.
Plaintiff argues in brief Mrs. Carlisle should not have left him unattended in the hall without first calling someone else to watch him. As previously stated, the testimony shows Mrs. Carlisle was called for an emergency and was away only for the brief period of fifteen minutes.
It is apparent from the evidence Nursecare gave as much care and attention to Murphy's needs and safety as could be reasonably expected without assigning a special nurse or attendant to him around the clock which clearly was not within the understanding of either party at the time he was admitted. The only other means of preventing him from escaping if he so desired would have been to either lock him in his room, or to have had someone watching all ground level exit doors, or to have locked these doors, neither of which would have been feasible. Mrs. Murphy understood the physical capabilities of the institution when she admitted the decedent and knew better than anyone else whether they were appropriate for her husband's care in view of the episodes she had encountered with him during the month or so previous to this time.
We conclude there is no showing that Nursecare did not use reasonable care under the circumstances and plaintiff's demands against this defendant and its insurer should be rejected.
For the foregoing reasons the judgment appealed from is affirmed insofar as it rejects plaintiff's demands against Timothy P. Lynch and Allstate Insurance Company, and the award in favor of plaintiff against Nursecare of Shreveport, Inc., and St. Paul Fire and Marine Insurance Company is reversed and plaintiff's demands against these defendants are dismissed.
All costs of this proceeding, including this appeal, are taxed against plaintiff.
AYRES, J., dissents, without written reasons.