493 So.2d 819 (1986)
Joy McGILLIVRAY, et al., Plaintiffs-Appellees,
v.
RAPIDES IBERIA MANAGEMENT ENTERPRISES, d/b/a Bossier Health Care Center, Defendant-Appellant.
No. 17949-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1986.
*820 Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer, Shreveport, for defendant-appellant.
James B. Wells & Associates by Sam A. Smith, Bossier City, for plaintiffs-appellees.
Before HALL, C.J., and MARVIN and NORRIS, JJ.
MARVIN, Judge.
In this wrongful death action, the defendant nursing home operator appeals a judgment in favor of the four adult children of the decedent, Odus Fox, who was a 16-month ambulatory resident of the home (Bossier Health Care Center). Mr. Fox died of heart failure after he left the home, unattended, in 42 degree weather wearing only his socks, shorts, and a pajama top.
The trial court specifically found that defendant's employees negligently failed to monitor or supervise Mr. Fox, knowing his condition and his tendency to wander, and being expressly authorized by his children to physically restrain him when necessary to protect against his tendency to wander. The court awarded $25,000 wrongful death damages to each plaintiff. We affirm.
Notwithstanding defendant's arguments to the contrary, we find that the record supports the conclusions of the trial court that defendant's substandard care, factually and legally, caused or contributed to the death of Mr. Fox. These findings are not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Additionally, the amount awarded is not clearly excessive or abusively high, even in view of Mr. Fox's poor physical condition and the likelihood that he would never fully recover. Reck v. Stevens, 373 So.2d 498 (La.1979).

FACTS
Odus Fox, 69 years of age, who was known to be suffering from cardiovascular problems, wandered outside the nursing home at about 4:00 a.m. wearing only his socks, shorts, and pajama top on a January morning when the temperature in Bossier City was about 42 degrees. Fox's body was found, without pulse or respiration, about 15 to 30 minutes after nurses discovered he was missing from his room. A nurse revived him briefly by using CPR, but death occurred a few minutes later.
Mr. Fox's children are Joy Fox McGillivray, Janie Fox Haynes, James Odus Fox, and Julius Ray Fox. Mrs. McGillivray and Mrs. Haynes placed Mr. Fox in the home in August 1981, while Robert Sellers was the home administrator. At their first meeting, Sellers was told that Mr. Fox was being transferred from another nursing home because "he had been getting out a *821 lot." Mrs. McGillivray testified that she told Sellers her father suffered from hardening of the arteries, diabetes, and poor eyesight and that he was "senile" and "wandered constantly." At Sellers' request, the two daughters of decedent signed documents authorizing employees of the nursing home to physically restrain Mr. Fox when necessary to insure his safety. The daughters did not instruct that Mr. Fox be restrained under any particular circumstances; they merely authorized restraint when his conduct warranted or when a physician so ordered.[1]
The rooms at the nursing home are arranged along two parallel hallways. Each hall exits to the parking lot and receiving area of an adjoining pet store supply business. Mr. Fox was placed in a room located about midway between the exit and the nurses' station for that hall. The nurses' station was located on the same side of the hall as Mr. Fox's room. The diagram attached as Appendix A shows the relative locations.
The nursing home records, including nurses' notes, doctor's orders, and monthly reports on individual patients, indicate that Mr. Fox frequently wandered away from the supervision of nurses during his 16-month stay in the home. In October 1981 Mr. Fox wandered outside and across the street and was noted as "missing" for about 10 minutes. The nurse's note states "family notified and informed that he will be restrained at night to avoid wandering outside building. Daughter states she understands." A November 1981 note states "patient is confused as to time and place and wants to leave daily. Needs close supervision in all areas ... walks about frequently and needs to be checked to prevent leaving the premises." Another note states "needs constant supervision, wanders away and very confused." Similar notes appear in the records through 1982. One nurse testified that Mr. Fox had wandered outside to a nearby pasture "about 5 or 6 times," where he enjoyed watching the cows. It was also stated that on one occasion Mr. Fox climbed over a barbed wire fence and walked "a pretty good piece" into the pasture.
At trial, nurses described their methods of restraint. Bars attached to the beds are raised to prevent patients from falling out of bed, but Mr. Fox managed to climb out of bed even with the bars in place. Nurses occasionally placed Mr. Fox in a vest-type harness that allowed him to move his head, legs, and arms while in bed.
About 4:00 a.m. on January 26, 1983, Lucy Braden, a nurses' aide, discovered Mr. Fox was not in his room. She notified Renee Cooper, the LPN on duty, and a search ensued. Ms. Braden testified that about 15 to 30 minutes later, a nursing home cleaning lady reported that Mr. Fox had fallen in the pet supply parking lot. A worker at the pet supply business testified that one of his co-workers came in the office and said he had seen something that looked like a dummy in the parking lot. He said they then met the two nurses outside (Braden and Cooper) and directed them to where Mr. Fox had fallen between two cargo pallets near the parking lot fence.
Nurse Cooper immediately administered CPR after finding that Mr. Fox had no pulse. When she detected a weak pulse, Nurse Cooper told one of the pet supply workers to call an ambulance. When the worker returned, the four placed Mr. Fox on a blanket and carried him into the pet supply office, where Nurse Cooper finally announced that Mr. Fox was dead.
Defendant complains that each of the trial court's findings of negligence or breach of duty, factual and legal causation, and assessment of damages are clearly erroneous or abusive.

SUBSTANDARD CARE
The standard of care imposed on a nursing home is that of reasonable care, *822 considering the patient's mental and physical condition. Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3d Cir. 1971); Noble v. Insurance Company of North America, 248 So.2d 12 (La.App. 1st Cir.1971); Oswald v. Rapides Iberia Mgmt. Enterprises, 452 So.2d 1258 (La.App.2d Cir.1984). This court has said
There is no presumption of negligence on the part of the institution merely because of the injury to a patient ... [A]fter showing it has provided reasonable care for the safety and well being of its patient under the circumstances presented, a nursing home is not liable for injury caused by an untoward event unless it has breached a contractual agreement to furnish special care beyond that usually furnished which relates to the injury giving rise to the cause sued on. Murphy v. Allstate Insurance Company, 295 So.2d 29, 34-35, (La.App. 2d Cir.1974)
The record indicates that the nursing home employees did not agree about the circumstances under which they should restrain Mr. Fox and the mode of restraint they were authorized to use. On one occasion, Mrs. Haynes had visited Mr. Fox and observed him "tied with a [bed] sheet in a chair ..." She further explained
... it had rubbed him raw and he was screaming and crying ... and I told them I ... never [wanted] him tied with a sheet again. They had restraining things there to restrain him with, that was fine, but don't let me ... find him tied up in a sheet again. And I meant it.
Mrs. Haynes made these complaints to Joey and Geneva Nelson, who succeeded Mr. Sellers as administrator of the nursing home sometime after Mr. Fox was admitted. The Nelsons did not testify.
Defendant suggests that these instructions modified the initial restraint authorization given when Mr. Fox was admitted. We disagree.
Nurse Cooper said she understood that the Nelsons had been instructed by plaintiffs not to restrain Mr. Fox unless he "became agitated." Ms. Braden corroborated Nurse Cooper on this point, but explained that these instructions were communicated through Mr. Fox's records and not by direct contact with the Nelsons. The note in Mr. Fox's records was made by Registered Nurse Morgan. She testified that she was not on duty the night Mr. Fox died, but that one of the daughters had insisted that Mr. Fox be allowed to walk around. The note or order Nurse Morgan signed states "resident appears more confused now. Family does not want resident to be restrained in wheelchair with sheet. This is required as he runs away sometimes, keeping the staff busy bringing him back."
Ms. Braden said she did not look at the records, but that another nurse had simply told her Mr. Fox "was not supposed to be restrained." The instructions, according to Ms. Braden, made no distinction between routine and extraordinary restraint measures.
We do not interpret Mrs. Haynes' later complaint about the sheet as withdrawing or modifying the original authorization to restrain. Nurse Morgan's note expressly proscribes the use of a bed sheet restraint and not the harness restraint. The nurses' reluctance or failure to restrain Mr. Fox when necessary cannot be factually or legally excused in the light of the note of Nurse Morgan.
Defendant also argues that a restraint was not necessary because Mr. Fox appeared to be settled and resting in his room just before he wandered away. Nurse Cooper and Ms. Braden described the events leading up to Mr. Fox's disappearance. Nurses made rounds every two hours to administer medication and implement doctor's orders. Ms. Braden said she also made frequent "hall checks" between rounds during the night to see if residents are safely inside their rooms. She made rounds at midnight and 2:00 a.m. and again checked on Mr. Fox at 3:15 a.m. while attending to a patient in a nearby room. She said Mr. Fox was awake, but appeared calm and restful. Nurse Cooper said she last checked on Mr. Fox at about 3:30 a.m. *823 He was sitting up in bed and said that he was about to go back to sleep. Ms. Braden said she went on a break from 3:30 to 4:00 a.m. and while returning to her station, peeped inside Mr. Fox's room and noticed he was missing.
The trial court stated:
... the fact that this patient, who was elderly and had serious health problems and had the habit of wandering off and for whom his family had authorized the use of restraints, was able to simply walk out of [appellant's] facility ... clothed in light sleep attire on this cold night without anyone seeing him or being aware that he had exited the building, constitutes negligence on the part of the [appellant].
A preponderance of the evidence supports this finding and it is not manifestly erroneous. A nursing home's duty of care does not require that an attendant follow an ambulatory patient at all times. Robinson v. Gulf Ins. Co., 434 So.2d 487 (La. App. 2d Cir.1983). However, the degree of supervision required by the reasonable standard of care to each patient varies with the known physical and mental condition and propensities of the patient. See Nichols, Noble, and Oswald, supra.
Compare cases in which the care given was held adequate. In Nichols, supra, the ambulatory patient who wandered outside the home and collapsed had "enjoyed reasonably good health" and was "very active for his age." 245 So.2d at 545. In Murphy, supra, the court found that the nursing home had no special care or restraint authorization from the family or a doctor that would give the home any reason to expect that the patient, who had been in the home only four days, would wander outside, unattended.
Plaintiffs recognized that their father's known tendency to wander, when combined with his poor cardiovascular health, would sometimes require that he be restrained. Mr. Fox was placed in the home specifically because his children desired that he receive more observation and occasional restraint than they were able to provide. Notwithstanding Mrs. Haynes' proscribing the bed sheet restraint, and considering that the employees of the home knew Mr. Fox's condition and propensities, we must agree that the duty of care increases above the care required for the ordinary ambulatory patient in better control of his faculties than Mr. Fox. The findings below refer not to the failure of nurses to place Mr. Fox in the harness that night, but to their failure to guard against his leaving the premises. That Mr. Fox gave no particular signs of wanting to leave on any one occasion does not relieve the home of its duty to protect, against himself, a patient who is known to wander unexpectedly, especially in light of Mr. Fox's history of other unsuspected and undetected escapes.

CAUSE IN FACT
The autopsy report, prepared by Dr. George McCormick, states that Mr. Fox died of cardiac arrhythemia due to chronic congestive heart failure. Mellaril, a drug for treatment of emotional disorders, was found in urine obtained from the body. There was no evidence of traumatic injury, but there were minor abrasions on Mr. Fox's back, most probably caused, according to Dr. McCormick, by the fall or by efforts to move the body.
The record is replete with evidence of Mr. Fox's poor physical condition, both at the time of his death and at the time of his admission to the home 16 months before. The autopsy revealed severe hardening of all critical arteries and evidence of heart damage from prior heart attacks. Inadequate blood circulation severely impaired Mr. Fox's mental processes. His personal physician for 20 years, Dr. Forbing, testified that he had prescribed several types of medication for Mr. Fox's heart condition. Defendant complains in this respect that its employees' conduct did not causally contribute to Mr. Fox's death because, given his poor health, it is just as reasonable to conclude that he could have died of a heart attack while asleep in his bed as while wandering outside the nursing home.
The trial court found that
The preponderance of the evidence supports the conclusion that Mr. Fox was in very poor health and could have suffered a heart attack at any time ... [T]he preponderance of the medical evidence also shows that the exposure to the cold temperature caused his heart ... and ... lungs to work harder to maintain his body temperature, and thereby contributed *824 to or accelerated the failure of his heart and his resulting death.
These findings were based on the opinions of Drs. McCormick and Forbing that exposure to 42 degree air would accelerate the heart and respiration and aggravate Mr. Fox's already delicate heart condition. Dr. Forbing said "it was certainly a contributing factor."
Defendant's expert, Dr. Dienst, reviewed the autopsy and concluded that Mr. Fox's "condition" could not have been brought about by 30 minutes of exposure to 42 degree air. Dr. Dienst stated that although the exposure could accelerate heartbeat and respiration rates, the exposure did not "significantly accelerate" death. Mr. Fox was not exposed long enough to have suffered hypothermia, according to Dr. Dienst.
Given the conflicting testimony of these experts, the final determination of whether exposure contributed to death becomes a matter of credibility best resolved by the trier of fact. Sepulvado v. Willis-Knighton Medical Center, 459 So.2d 152 (La. App. 2d Cir.1984). Whether Mr. Fox fell in response to the heart attack or suffered the heart attack after he fell and was unable to get up is immaterial. The trial court could have accepted the testimony of plaintiff's experts over the testimony of defendant's expert. Mr. Fox's heart condition, of course, was not brought about by exposure. Although, as defendant contends, Mr. Fox could have just as easily died in bed, the effects of exposure, more probably than not, were substantial factors in his death. This finding, implicit in the reasons given for judgment, is not clearly erroneous.

SCOPE OF DUTY
Citing Murphy and Nichols, defendant argues that its duty to supervise Mr. Fox does not encompass or is not easily associated with the risk that he would suffer a heart attack while wandering outside the premises. Appellant contends its duty to supervise patients encompasses protection against only those risks of harm that arise from a patient's inability to look out for himself (physical hazards such as traffic and water) and does not encompass the risk of a patient dying from natural causes.
Though phrased in terms of legal causation, this argument relates more to the issue of cause in fact than to legal cause or scope of duty. When we accept the trial court's finding that exposure to the cold aggravated Mr. Fox's cardiovascular condition, we cannot agree that Mr. Fox died of purely "natural causes" unconnected with defendant's conduct. Once the cause-in-fact link is established, there is no reason to distinguish the risk of undue exposure to cold weather from that of drowning or being hit by an automobile. A person in Mr. Fox's mental and physical condition is no more able to detect the danger of exposure than he is the danger of a busy street or a water hazard.
Duties are intended to "protect some people under some circumstances against some risks." Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). The kinds of harm this duty is designed to avoid is not limited to the risk that Mr. Fox will encounter dangerous things or situations, such as street crossings or water hazards, while wandering outside the home. The scope or extent of one's duty is determined by the kind of harm suffered and by policy inquiries that question the ease of associating the risk of harm with the duty sought to be enforced.
When two or more factors combine to cause harm, (here, Mr. Fox's physical and mental condition and his exposure to the night air), these policy inquiries determine whether the particular factual cause associated with one's conduct is also a legal cause of the harm. See Finley v. North Assur. Co. of America, 476 So.2d 837 (La. App. 2d Cir.1985). The question of legal causation encompasses moral considerations of culpability and responsibility. See McNamara, The Duties and Risks of the Duty Risk Analysis, 44 La.L.Rev. 1227 at 1234 (1984).
Our consideration of these factors weighs in favor of placing within the ambit of the nursing home's duty the risk that Mr. Fox would come in contact with harmful outdoor conditions if permitted to leave the home during the night, unattended. That Mr. Fox died of a heart attack does not diminish the ease of associating the risk of exposure with the home's duty to keep ambulatory patients inside during the night. The very purpose of the duty is to protect patients who are physically able to move about, but mentally incapable of detecting *825 danger, from situations that, while perhaps harmless to a healthy person, present a risk of harm to an elderly person in poor health.
We find no policy reason, social, economic, or otherwise, that requires that we distinguish the risk Mr. Fox encountered from the more direct, physical risks encountered in Murphy and Nichols. Those cases are distinguishable because those nursing homes were found to have given adequate, reasonable care under their respective circumstances. Specifically, the patient in Nichols, who was ambulatory, did not habitually and unexpectedly wander away as did Mr. Fox. In Murphy, the nurses did not have the opportunity to observe and become familiar with the patient's habits because the nursing home had been open only about four days when Mr. Murphy wandered away and was fatally injured. Those cases do not limit the ambit of the nursing home's duty, which necessarily must be tailored to the peculiar circumstances of the individual patient who seeks to enforce the duty.

DAMAGES
The trial court noted that Mr. Fox's age and poor health were considered in the award of $25,000 to each plaintiff. Defendant contends the award is abusively high, in part, because plaintiffs are grown and have their own families, and because it is not likely that Mr. Fox would have lived much longer than he did.
Our review of prior awards in cases cited by plaintiffs in support of the award convinces us that the award was within the trial court's discretion. See LeJeune v. Allstate Ins. Co., 373 So.2d 212 (La.App. 3d Cir.1979), (award of $7,500 to each of three major sons for the loss of their 48-year-old father in a 1974 automobile accident increased to $20,000 each), and Camatsos v. Aetna Cas. & Sur. Co., 428 So.2d 1320 (La.App. 3d Cir.1983), ($15,000 awarded to each of two adopted sons for the loss of their 87-year-old father in an automobile accident).
The age and physical condition of the decedent are proper matters to consider in determining the amount of an award to children for the loss of love and affection of a parent, but we do not consider the award outside the trial court's discretion. Reck, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).

DECREE
At appellant's cost, the judgment appealed is AFFIRMED.

NOTES
[1] In a "medical evaluation form" completed while Mr. Fox was in the other nursing home, his physician had recommended that Mr. Fox be placed in a facility providing "professional nursing supervision for 24 hour care or observation... from RN or LPN for medication requiring vital signs, ... incontinence, ... agitated states,... etc."