528 So.2d 573 (1988)
Helen H. FIELDS, et al., Appellees,
v.
SENIOR CITIZENS CENTER, INC. OF COUSHATTA, et al., Appellants.
Janet Fields DUPREE and Randall Wayne Dupree, Appellees,
v.
SENIOR CITIZENS CENTER, INC. OF COUSHATTA, et al., Appellants.
Nos. 19,542-CA, 19,543-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
*575 Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer, Shreveport, for Helen H. Fields, et al.
Hicks & Bookter by S. Maurice Hicks, Jr., Sara E. Adams, Shreveport, for Janet Fields Dupree and Randall Wayne Dupree.
Cook, Yancey, King & Galloway by Eskridge E. Smith, Jr., Shreveport, for Capital Enterprise Ins. Group.
Gist, Methvin, Hughes & Munsterman by Howard B. Gist, Jr., Powers, Vaughn & Clegg by John Dale Powers, William E. Willard, Baton Rouge, for Senior Citizens, Inc. and Mount Vernon Fire Ins. Co.
Donald G. Horton, Coushatta, for Senior Citizens Center, Inc.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
*576 FRED W. JONES, Jr., Judge.
In these consolidated wrongful death actions, the widow and children of a 68 year old nursing home resident, who wandered away from the home and was struck and killed by a van driven by the victim's daughter, after a jury trial recovered judgment against the nursing home and its insurer. The defendants appealed. The husband of the daughter who ran over her father also appealed a judgment sustaining an exception of no cause of action with respect to his claim for loss of consortium. For the reasons hereinafter explained, we affirm.
At approximately 7:00 P.M. on April 5, 1986, William Fields, a resident of Senior Citizens Center, Inc. of Coushatta, left the premises of the nursing home unattended and attempted to traverse nearby Ringgold Avenue in Coushatta. In the process he was struck and killed by a van driven by his daughter, Janet Fields Dupree.
The victim's widow, Helen Fields, and four of her children sued the nursing home and its insurer, Mount Vernon Fire Insurance Company, for damages for the death of the nursing home resident. Also named as a defendant was the insurer of the vehicle driven by Ms. Dupree, with the allegation that the combined negligence of the nursing home and Ms. Dupree was the cause of the death. Ms. Dupree also sued the nursing home and its insurer, alleging that the nursing home had breached a duty owed to the decedent by failing to keep him under observation and proper restraint and allowing him to leave the premises without supervision. Randall Dupree joined in his wife's petition, claiming loss of consortium.
The nursing home and its insurer filed answers and a third party demand against Ms. Dupree, alleging that the sole cause of the accident was the combined negligence of the decedent and his daughter. In the alternative, defendants claimed entitlement to indemnity or contribution on the basis of comparative fault principles if they were cast in judgment.
Capital Enterprise Insurance Group (Ms. Dupree's insurer) filed answers, denying that the negligence of its insured caused the accident, and filed a cross-claim against Senior Citizens Center and its insurer.
According to the record, Dr. Alcantara, physician at the VA Hospital in Shreveport, stated that William Fields was admitted to the psychiatric ward of the hospital in 1980 for psychosis. He was again admitted in 1982 with mild dementia. Fields was again seen in 1985 for treatment of a skin cancer and in conjunction with this was referred for psychiatric consultation. At this time his mental condition was described as "poor" and he seemed to be suffering from serious confusion. The doctor observed Fields on a daily basis and made note of instances when he got lost and could not find his bed. Since Fields' wife was unable to care for him, at the request of the family, nursing home placement was arranged. He was admitted to the Senior Citizens Center on February 14, 1986.
Dr. Hanna, a general practitioner, testified that William Fields had been his patient for some 30 years. When Fields was admitted to the nursing home, according to the doctor his mental state was one of confusion and disorientation as to time and place. The physician authorized the nursing home to use restraints on Fields as necessary. The standing orders provided: "to be used for the resident's safety at the discretion of the nurse in charge. This includes bed rail ... and safety belt." As directed by the VA hospital, a major tranquilizer was prescribed. This medication caused difficulty in speaking and blurred vision. Dr. Hanna said that any patient taking this tranquilizer had to be under supervision at all times. The witness stated that he last saw Fields on April 1, 1986 and that the patient was suffering from dizziness and vertigo.
Lynn Stephens, administrator of the nursing home, testified that on the date of the accident the home had 81 residents and all beds were occupied except for two. The nursing home employed 22 nurses and six employees were on duty at the time of the accident, which occurred at supper timea very busy time of the day. Fields had been placed in a special room close to the nursing station in order to give him additional *577 care and supervision. The patient was at the nursing home on a six month VA contract, which paid for room and board about $1350 per month.
Stephens described the physical layout of the home, conceding that the front door could not be seen by the nurse at the desk in the nursing station. After the accident a mirror had been installed so that the door could be observed from the nurse's station. As to the security system, this was turned on and off at the discretion of the nurses. However, they were instructed to turn it on after the evening meal and after visitors had departed. However, Stephens said that it was not turned on the night of the accident because the loud noise annoyed the residents.
According to Stephens, when Fields first arrived at the nursing home he wandered off quite a bit, but this had improved with time. Stephens did not believe that, at the time of the accident, Fields needed individual supervision, since he could walk around the grounds and return on his own.
Evelyn Bamberg, in charge of nurses for the day shift at the nursing home, testified that Fields was a quiet but confused patient when admitted and sometimes seemed to be hard of hearing. At first he caused the staff problems because of a tendency to try to wander off. According to her notes Fields wandered off down the road on February 17, and, upon being returned, was restrained. Waist restraints had to be applied on March 6 because of the patient's combativeness and attempts to wander off. As of March 15 he continued to get lost in the nursing home. Although beginning to improve, the witness still found Fields getting confused about the location of his room. He was the only resident of the nursing home at that time with a propensity to wander off.
Sally Johnson, nurse in charge of the night shift at the nursing home, testified that Fields was admitted as a confused, mentally incompetent person who needed supervision. He needed restraints on an occasional basis because he would not stay in his room and wanted to go home. Fields was not aware, frequently, of where he was going and tended to wander off. She was aware of the patient's poor vision and hearing problem. Despite occasions when he had wandered off, at the time of the accident there had been quite an improvement in Fields' condition. He was much calmer and more cooperative, and seemed to be adjusting to the institutional environment. The last time it was necessary to restrain him for the whole shift was at least 1½ weeks before the accident.
Ms. Johnson stated that she did not send an aide to accompany Fields to his room on the night of the accident but had seen him going towards his room at about 7:00 P.M. The witness then went to the medicine room to begin pouring medication. The ward clerk, Stephanie Miller, was supposed to be in the nurse's station. Ms. Johnson said that she had not turned on the alarm system because she only did that when deemed necessary. The witness testified that she heard Ms. Miller scream "No, Mr. Fields" and then heard the impact.
Stephanie Miller, ward clerk at the nursing home, was working at the time of the accident. She helped feed and care for patients and answered calls from their rooms. She testified that the nurses had told her to watch Fields carefully because he would wander off and had done so before. In fact, the day of the accident Fields had tried to leave and Ms. Miller stopped him at the door. He said that he was going home and pointed to a big house across the street. Ms. Miller told Fields that he did not live there but seemed unable to convince him of this. Ms. Miller said she informed Ms. Johnson of the incident and Fields was restrained.
Ms. Miller explained, with reference to the alarm system, that it was not activated at any fixed time, but Ms. Johnson usually turned it on at night. It was not activated at the time of the accident. The witness also stated that when Ms. Johnson was in the medicine room preparing medicine the nurse did not call anyone to remain at the nurse's station to watch those who left the building. The front door was not visible from the medicine room.
*578 When Fields wandered out just before the accident, Ms. Miller was down the hall with another patient. One of the residents approached Ms. Johnson and reported Fields had gone outside. Ms. Miller immediately left to look for Fields. She saw Fields across the street south of the nursing home, on the shoulder of the road walking toward Coushatta. The witness said she went to the parking lot and started callings Fields. He stopped and looked at her. Ms. Miller instructed Fields to stand there until she could get to his position and she started toward him. Fields was then struck by the van.
Jerry Bamberg testified that he was an eyewitness to the accident, being en route from Campti to Shreveport. It had just turned dark and Bamberg had his lights on, as he passed the nursing home on Hwy. 71. He was traveling about 50-60 feet behind a van and both were going about 30-35 miles per hour. Traffic was moving slowly in both directions. Bamberg said he noticed the van swerve to the left and he saw a man lying in the highway. Bamberg did not see anyone on the highway before the accident.
Officer Scotty Hill testified that he responded to a call about the accident and, upon arriving at the scene, found Ms. Dupree lying in the corner of a parking lot hysterically screaming, "I killed my daddy, I killed my daddy, I ran over my daddy, I didn't see him, I didn't see he was there."
Ms. Dupree testified that just prior to the accident she had been to the grocery store and was returning home. Driving down the road near the nursing home, the witness said she saw a person or something moving to her left and then received an impact to the right of her van. She felt her right back tire run over something. It was dark when the accident occurred and Ms. Dupree had her lights on low beam because of the traffic. She then pulled into a parking lot and returned to discover that she had run over her father.
Ms. Dupree stated that since the accident she had experienced problems sleeping, including waking up in the middle of the night and nightmares. She has sought professional counseling. At the time of the trial, on February 3, 1987, Ms. Dupree's life had still not returned to normal, according to her. She had difficulty in resuming driving. She was not able to stay alone with her children at night and relived the accident on a frequent basis. Along with the other children, she testified to the closeness of the family. Ms. Dupree's testimony with reference to her nervous condition was corroborated by the testimony of her husband.
George Martin, marriage and family therapist, said he counseled the Duprees weekly from June 20, 1986 through August 28, 1986 to assist Ms. Dupree in recovering from the trauma of running over her father. The witness stated that Ms. Dupree's grieving process was complicated by her feelings of responsibility and guilt related to the accident. On the first visit, Martin found Ms. Dupree to be emotionally depressed and immobilized in terms of carrying out daily responsibilities. She had isolated herself from her family and community and suffered from sleep disturbances. Upon last seeing Ms. Dupree, Martin found that she had reached a certain level of acceptance, but felt that emotional scars and traumatic memories would always remain, and her life would never completely return to normal.
Ms. Helen Fields, widow of the decedent, testified that they were married in 1949 and lived together until he was institutionalized. Fields was placed in the nursing home because his wife was unable to supervise him. Ms. Fields said she explained to the nursing home workers about her husband's tendency to wander off and that she had to watch him closely at home. She was advised that he would be closely supervised in the nursing home.
Ms. Fields stated, with regard to loss of income, that she and her husband together had received $875 per month from the VA, Social Security and his retirement. Since his death she had received $442 per month. The witness conceded that part of their income had been used to support her husband.
*579 The jury found that the nursing home was solely at fault and awarded Ms. Helen Fields $200,000; Ms. Dupree $92,500; and the other children $7,500 each. Judgment was rendered accordingly. As to the claim of Randall Dupree for loss of consortium, an exception of no cause of action was sustained.
Appellants have raised the following issues on appeal:
I. Whether the jury's fault apportionment was manifestly erroneous;
II. Whether the jury abused its discretion by awarding $200,000 to Helen Fields and $92,500 to Janet Fields Dupree;
III. Whether the trial court erred in sustaining defendant's exception of no cause of action with respect to Randall Dupree's claim for Loss of Consortium;
IV. Whether the trial court erred in refusing to allow the purported release into evidence;
V. Whether the trial court erroneously allowed improper argument at the close of the case by counsel for plaintiff.
I. Negligence of the Nursing Home
Defendant nursing home and its insurer claim the jury's finding that the nursing home was solely responsible for the accident and Fields' death is manifestly erroneous. It is argued that the conduct of the nursing home staff did not fall below the standard of care required of it by law in any manner, and that furthermore, the conclusion that Fields' unnoticed departure was necessarily due to the negligence of defendants is precluded by his family's knowledge that individual supervision would not be provided.
While it is true a nursing home is not the insurer of the safety of its residents, and negligence is not presumed merely because a resident is injured, Murphy v. Allstate, Insurance Company, 295 So.2d 29 (La.App. 2d Cir.1974), writ refused, 299 So.2d 787 (La.1974), the standard of care imposed upon a nursing home is that of reasonable care, considering the patient's known mental and physical condition. McGillivray v. Rapides Iberia Management Enterprises, 493 So.2d 819 (La.App. 2d Cir.1986); Booty v. Kentwood Manor Nursing Home, Inc., 483 So.2d 634 (La.App. 1st Cir.1985), writ denied, 486 So. 2d 754 (La.1986); Oswald v. Rapides Iberia Management Enterprises, 452 So.2d 1258 (La.App. 2d Cir.1984).
Defendants correctly contend that a nursing home's duty to its residents generally does not include having an attendant follow an ambulatory patient at all times. Oswald, supra; Robinson v. Gulf Insurance Company, 434 So.2d 487 (La.App. 2d Cir.1983), writ denied, 439 So.2d 1075 (La. 1983). However, a nursing home is required to take reasonable steps to prevent injury to ambulatory, but mentally confused patients. Booty, supra.
In this case, the testimony reveals that all Senior Citizens Center employees involved in the care and supervision of Fields were aware of his confused mental state and his propensity to wander off the nursing home grounds unattended.
In the Booty case, which is factually very similar to this one, and which also involved a mentally confused resident who tended to wander, the court stated:
"Here the nursing home had reasonably responded to the problem by installing an alarm system on their exit doors (which, pursuant to fire regulations, could not be locked from the inside), with the exception of the front door. This system, if properly activated at all times, would enable the nursing home staff to determine immediately when a patient had left the building without authorization (and thus without adequate supervision) and from which door the exit had been made. This system, if functioning at all times, would enable the staff to take immediate steps to find the wandering patient and return him or her to the building.
However, solely for the convenience of the staff, Kentwood Manor kept the exit doors propped open until 11 p.m., thus *580 rendering the alarm system useless. Booty, supra, at 639."
We find this particularly applicable here, for Senior Citizens Center, Inc. also had such an alarm system which it failed to properly use. Testimony in the record reveals that the alarm system was not activated when Fields left the building unnoticed at around 7:00 P.M. on the night of this accident. Several staff members stated that although the general policy was to turn it on around 7 or 7:30 P.M., it was sometimes not turned on until much later, if at all, because its loud and piercing sound was annoying. Also, almost every other witness who testified stated that he never heard the alarm sound when he entered or exited the building.
In addition to the misuse of the alarm system, a review of this record also reveals that the physical layout of the building prevented observation of the front door by staff members in the nursing station; and that the nursing station was sometimes left vacant while employees attended to various matters. Thus, there were obviously times when some residents were left without supervision.
We agree with the trial judge in McGillivray, supra, who, faced with a similar situation, concluded that:
"the fact that this patient, who was elderly and had serious health problems and had a habit of wandering off and for whom his family had authorized the use of restraints, was able to simply walk out of [appellant's] facility ... clothed in light sleep attire on this cold night without anyone seeing him or being aware that he had exited the building, constitutes negligence on the part of [appellant]." McGullivray, supra, at 823.
II. Contributory Negligence of Janet Fields Dupree and/or William Fields
Defendants also contend the jury's fault apportionment is manifestly erroneous because Janet Fields Dupree and/or William Fields were contributorily negligent and thus at least partially at fault in causing this accident. In support of this position, defendants rely on several cases holding that a motorist is under a duty to see what an ordinary prudent driver should have seen under the circumstances, and to avoid striking objects in the road ahead. We agree that this is the general rule applicable to accidents involving motorists and pedestrians. Geoghegan v. Greyhound Corp., 226 La. 405, 76 So.2d 412 (1954); McLeod v. Woodel, 341 So.2d 1261 (La.App. 2d Cir.1977), writ denied, 343 So.2d 735 (La.1977).
However, this argument fails to take into account an established exception to this rule. Motorists driving at night are not charged with the duty of guarding against striking an unexpected or unusual obstruction, which is difficult to see, and which he had no reason to anticipate he would encounter on the highway. Frank v. State Farm Mutual Automobile Ins. Co., 254 So.2d 102 (La.App. 3d Cir.1971). Furthermore, a driver is liable for striking a pedestrian only when there is an opportunity to appreciate the pedestrian's peril in time to avoid the accident. McKenzie v. New Orleans Public Service, 455 So.2d 678 (La.App. 4th Cir.1984), writ denied, 460 So.2d. 1043 (La.1984).
In Rowe v. Hardware Dealers Mutual Fire Ins. Co., 208 So.2d 409 (La.App. 4th Cir.1968), writ refused, 210 So.2d 505 (La. 1968), evidence that a pedestrian walked or ran into the side of a motorist's vehicle and that the motorist did not see the pedestrian until just before the impact was held sufficient to uphold a jury finding of no liability on the part of the motorist. In McKenzie, supra, a bus driver was held not negligent in striking a 13-year old pedestrian where, even if he had seen him on the walkway, (he did not) he could not have avoided the accident since the frightened boy suddenly ran into the side of his bus in an attempt to flee a large dog.
In our case, Janet Dupree testified she neither saw nor expected to see Fields before she hit him. The record is devoid of evidence of any negligence on her part. Her testimony that she was driving within the speed limit was corroborated by both eyewitnesses to the accident, Jerry Bamberg and Stephanie Miller. Nor was there *581 any testimony that she was driving erratically or ever lost control of her vehicle. She had her headlights on low beam due to the oncoming traffic on the highway. No tickets or citations were issued to her by Officer Hill.
Moreover, in addition to the fact that the lighting conditions were poor, the evidence indicates that just prior to the accident, Stephanie Miller was shouting and waving her arms in the nursing home parking lot, in an attempt to capture Fields' attention. This satisfactorily explains Ms. Dupree's failure to see her father, as these actions probably distracted her attention from the road.
Defendants claim Fields' actions also constitute contributory negligence, thus barring or reducing plaintiffs' recovery proportionately to his fault. Much emphasis is placed on the testimony regarding Fields' improved condition and seeming adjustment to his environment in the days preceding his death. It is argued that even if he had physical and mental infirmaties, his conduct must still be reasonable under the circumstances, including his condition and his knowledge of his condition, and that he breached his duty to avoid placing himself in peril. It is also contended that the statutory duties imposed upon pedestrians to yield to traffic in the absence of marked cross-walks (La.R.S. 32:213) and to refrain from suddenly leaving a curb or place of safety and walking into the path of an oncoming vehicle (La.R.S. 32:212[B]) were violated by him.
Contributory negligence is a matter of fact to be determined in light of the circumstances of each case. Soileau v. South Central Bell Telephone Company, 406 So.2d 182 (La.1981). The test is whether or not the actor was exercising ordinary and usual care, or acting reasonably under the circumstances at the time of the accident. Reasonableness of conduct depends in part on the actor's characteristics.
A child is not held to the same standard of care as that of an adult; rather, the test is whether the child, considering his age, background and inherent intelligence, indulged in gross disregard of his own safety in the face of known, understood and perceived danger. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985), writ denied, 476 So.2d 353 (La.1985).
In discussing the standard of care applicable to handicapped persons, the court in Roberts v. State, Through Louisiana Health and Human Resources, 396 So.2d 566 (La.App. 3d Cir.1981), affirmed, 404 So.2d 1221 (La.1981), quoted the following from W. Prosser, The Law of Torts, § 32, pg. 151-52 (4th Ed. 1971):
"As to his physical characteristics, the reasonable man may be said to be identical with the actor. The man who is blind... is entitled to live in the world and to have allowances made by others for his disability, and he cannot be required to do the impossible by conforming to physical standards which he cannot meet ... At the same time, the conduct of the handicapped individual must be reasonable in the light of his knowledge of his infirmity, which is treated merely as one of the circumstances under which he acts... it is sometimes said that a blind man must use a greater degree of care than one who can see; but it is now generally agreed that as a fixed rule, this is inaccurate, and that the correct statement is merely that he must take the precautions, be they more or less, which the ordinary reasonable man would take if he were blind." Roberts, supra, at 567.
Just as children are not held to the same standard of care as are adults, a relaxed standard of care is also generally held applicable to a situation involving the alleged contributory negligence of persons subject to the infirmities of old age. Garner v. Crawford, 288 So.2d 886 (La.App. 1st Cir.1973).
Disability resulting from advanced age affects the standard of care required. A person who suffers from impaired senses and mental facilities due to old age is not guilty of contributory negligence where his failure to use that degree of care which an ordinarily prudent person would use under the same or similar circumstances is due to such disability. La Cava v. City of New Orleans, 159 So.2d 362 (La.App. 4th Cir. 1964).
*582 The record is replete with testimony indicating Fields' mental confusion and inability to care for himself or look after his own safety. James Brown, Assistant Chief of Social Work at VA Medical Center, testified that while he was visiting Fields in the nursing home he wandered out of his room and had to be brought back by a nurse; that he was confused and lost. He further testified that his conversation was not lucid and he did not know where he was. Ms. Sally Johnson, employed as an LPN at the nursing home, testified that Fields was admitted as a confused, mentally incompetent person who needed supervision. She also stated he had poor vision and hearing problems.
Several of Fields' treating physicians testified to his "poor mentality", and to the fact that he was extremely sedated most of the time. Finally, several of his children testified he was confused as late as one week before the accident.
Standards of care for nursing homes, motorists and handicapped persons are questions of law, but determinations of negligence and contributory negligence are factual, to be made by the judge or jury. Absent a showing of manifest error, a reviewing court will not disburb a factual determination of this nature. To find manifest error, the record must support a conclusion that the factual determination was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Defendants have the burden of proving decedent's contributory negligence. Smith v. Borchers, 243 La. 746, 146 So.2d 793 (1962). The jury could have reasonably found that the nursing home breached its duty to its resident, which breach caused his death, and that the conduct of Janet Dupree and Fields was reasonable under the facts and circumstances of this case. We find ample evidence in the record to support the jury's apportionment of fault in this case and therefore will not disturb it on appeal.
III. Are the damages awarded to Helen Fields and Janet Fields Dupree excessive?
Defendants argue that the awards of $200,000 to Helen Fields and $92,500 to Janet Dupree are excessive. It is contended that Fields' life expectancy was much shorter than alleged; Ms. Fields' lost income claim is inflated because she was to be required to pay for Fields' room and board once his VA contract with the nursing home expired, and that Janet's award of $85,000 in excess of what her siblings received is not justified by the record.
Before a Court of Appeal can disturb a quantum award made by a trial court, the record must clearly reveal that the trier-of-fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Towns v. Georgia Casualty & Surety Co., 459 So.2d 124 (La.App. 2d Cir.1984).
Discussing the function of appellate courts in reviewing damage awards, the Supreme Court, quoting its previous decisions on the issue stated:
"Unless the record demonstrates that the trial court abused the `much discretion' provided for in fixing damages (C.C. 1934), the appellate court should not disturb the award. The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it. That such evidence might also support a greater (or smaller) award will not justify a change in the amount by the appellate court [citations omitted].
A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier-of-fact [citation omitted]. Coco, supra, at 334."
An award of $200,000 to a surviving spouse for loss of love and affection has been held by the Supreme Court to be within the jury's discretionary range. Cheatham v. City of New Orleans, 378 So.2d 369 (La.1979). Here, Mrs. Fields' award of $200,000 included loss of love and *583 affection and lost income. The record fully supports the award, and we find no abuse of discretion.
There is also sufficient evidence in the record to justify the $92,500 award to Janet Dupree, even though her siblings only received $7,500 each. The testimony of her counselor, George Martin, indicates she suffered mental anguish over and above that suffered by her siblings, due to her guilt feelings from her involvement in the accident which caused her father's death. Martin testified that she will probably never fully recover from this emotional trauma and Janet and her husband both testified regarding the strain on their marriage which has resulted, and her continuing anxiety and sleeping problems.
IV. Did the trial court err in refusing to allow the release into evidence?
Defendants' claim that the court erred in excluding that portion of the admissions document purporting to release it from liability for accidents of this nature, is without merit. We agree with the trial judge, who concluded that an attempt to prospectively absolve oneself from liability for one's negligent acts is against public policy. Whittington v. Sowela Technical Institute, 438 So.2d 236 (La.App. 3d Cir. 1983), writ denied, 443 So.2d 591 (La.1983); Sandel & Lastrapes v. City of Shreveport, 129 So.2d 620 (La.App. 2d Cir.1961). However, even if error, we find the exclusion of this evidence to be harmless, as each member of the Fields family testified that he or she knew that Senior Citizens Center does not provide individual supervision of residents.
V. Did the trial court err in overruling the objection to allegedly prejudicial remarks contained in plaintiff's closing argument?
Finally, defendant complains that counsel for plaintiffs improperly asked the jury to place themselves in plaintiffs' shoes during his closing argument, and that this had such a prejudicial effect as to require reversal.
Parties to an action are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice, and counsel should confine his argument to the evidence of the case and inferences properly drawn therefrom, and should avoid appealing to the prejudice of the jury. As long as they are based on the facts of the case, however, appeals to sympathy are not necessarily considered improper, and furnish no grounds for complaint. Flights of eloquence and some touches of pathos are even allowable, as long as the foregoing rule is not violated. Temple v. Liberty Mutual Ins. Co., 316 So.2d 783 (La.App. 1st Cir.1975), affirmed, 336 So.2d 299 (La. App. 1st Cir.1976).
Counsel for plaintiffs did not mention anything in argument that was not already properly before the jury as evidence. The unusual facts and circumstances of this case had been brought out in trial, and we find no abuse of discretion by the trial court in this regard.
VI. Randall Dupree's claim for Loss of Consortium
Randall Dupree appeals the trial court judgment sustaining defendant's exception of no cause of action with respect to his claim for Loss of Consortium. Randall Dupree clearly has no cause of action under the wrongful death statute, (La.C.C. Art. 2315.2) for, as the husband of the daughter of the deceased, he does not fall within any of the described categories of beneficiaries entitled to sue for wrongful death. Roche v. Big Moose Oil Field Truck Service, 381 So.2d 396 (La.1980).
Although Dupree may have had a cause of action under La.C.C. Art. 2315.2, the basis of his right to relief was not pled with sufficient particularity to support his claim. Therefore, the trial judge did not err in sustaining the exception. This decision is moreover supported by the record.
CONCLUSION
For the foregoing reasons, we AFFIRM the judgments of the trial court, at appellants' cost.