632 So.2d 375 (1994)
Gerard A. MATHIEU, et al.
v.
IMPERIAL TOY CORP., et al.
No. 93-CA-1182.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1994.
Rehearing Denied March 17, 1994.
*377 R. Glenn Cater, Nancy Collins Cater, Cater & Willis, New Orleans, and William P. Quigley, New Orleans, for plaintiff/appellant.
Michael G. Riehlmann, Nolan P. Lambert, Asst. City Attys., Bruce G. Whittaker, Deputy City Atty., Bruce E. Naccari, Acting First Asst. City Atty., Kathy L. Torregano, City Atty., New Orleans, for defendant/appellant.
Before BARRY and KLEES, JJ., and JAMES C. GULOTTA, J. Pro Tem.
BARRY, Judge.
The City of New Orleans appeals a judgment for $3,962, 193.90 in favor of Gerard Mathieu and for $101,600.00 in favor of his daughter, Areatha Mathieu, for damages caused when Mr. Mathieu was shot by a New Orleans police officer. The City claims:
1) It is not liable;
2) It is immune from liability pursuant to La.R.S. 9:2798.1;
3) Plaintiff's comparative negligence is too low;
4) The manufacturer of the toy gun has a higher percentage of fault;
5) Future medical expenses are incorrect;
6) The award to Ms. Mathieu for loss of consortium is excessive;
7) The general damages cannot exceed $500,000 under La.R.S. 13:5106(B)(1).
Gerard and Areatha Mathieu also appeal, asserting it was error to assign any percentage of fault to the toy manufacturer.

*378 FACTS

On the night of May 16, 1988 the New Orleans Police Department received a report that a man with a gun was seen near the Lafon Nursing Home, just off St. Bernard Avenue between Senate and Caton Streets. A patrol car was sent to investigate, but the responding officers advised that the subject was not in the area.
A short time later it was again reported that a man with a gun was peering into windows at the nursing home. Officers Armando Asaro and Gary Guggenheim responded to the call. They left their car in the street near a side entrance to the facility, just past the driveway to the home's parking lot. At the side entrance the officers spoke briefly with a security guard and a nursing assistant who said the man had a gun, but he now appeared to be sleeping. They pointed to a man lying in the grass just outside the parking lot behind the building, about forty or fifty feet away.
Officer Guggenheim approached the man quietly through the parking lot. He intended to remove the gun and was concerned whether the man was asleep. About twenty feet away Guggenheim drew his service revolver when he saw the gun in the man's hand. When he was four to six feet away the subject's hand came up with the gun and Officer Guggenheim fired. He or his partner may have shouted "police" just before, or simultaneously, with the first shot. After three or four shots, Officer Guggenheim paused because he thought the man was going to drop the gun, but he quickly resumed fire when he realized the gun was pointing at him and the man was moving.
Officer Asaro was about twenty-five feet behind his partner. He saw the subject bring his hand up and point the gun at Officer Guggenheim, but Asaro could not respond because his partner was in the line of fire. After Guggenheim fired six rounds, he dropped to the ground to reload and rolled to the side. Officer Asaro saw the man rising with the gun so fired three times and the man fell backward.
The officers approached the wounded man and stepped on his hand to get the gun away. The gun was crushed because it was a plastic toy. The officers later learned that the man, Gerard Mathieu, had chronic paranoid schizophrenia but was known in the neighborhood as a harmless character. They also learned that Edgar Tanner, who had been sitting in a lawn chair on the corner, knew that the gun was a toy.
Mr. Mathieu became a paraplegic from the gunshots; his pre-existing mental condition was complicated by depression about his paralysis. He became hostile and refused to comply with treatment and after-care instructions, leading to repeated severe pressure sores and other infections that required surgery and hospitalizations. Because of the psychiatric underlay to his physical condition, 24-hour attendant care by either family members or in a nursing facility would be necessary for the remainder of Mr. Mathieu's life.
The trial court found the manner in which the two police officers approached Mr. Mathieu was negligent and a legal cause of his injuries. The judge attributed twenty percent fault to Imperial Toy Company, the manufacturer of the toy gun who had been released by a settlement. Mr. Mathieu's losses included $203,599.88 for past medical expenses (stipulated), future medical expenses of $3,749,142.60, and $1,000,000.00 for general damages based on a life expectancy of twenty-seven years. Areatha Mathieu, who was seventeen at the time of the shooting, was awarded $25,000.00 for past loss of consortium and $102,000.00 for future loss of consortium. Those awards were reduced by the twenty percent fault attributed to the toy manufacturer.

LIABILITY
The City asserts that the trial court's determination of liability is wrong because the experts agreed that even if the officers had approached differently, Mr. Mathieu may have brought the gun up towards them anyway, requiring them to fire in self defense. It is thus argued that Mr. Mathieu's conduct, not the breach of any duty owed by the police, was the cause-in-fact of the shooting.
Under a duty-risk analysis, the cause-in-fact inquiry is very limited in scope, usually *379 asking only if the plaintiff's harm would have occurred "but for" the defendant's conduct. Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991), on rehearing, 605 So.2d 1050 (La.1992). If multiple causes exist, then "to the extent the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met." Id.
In Roberts v. Benoit, supra, the plaintiff was shot by an off-duty cook who had been commissioned, but not fully trained, as a deputy sheriff. Though the Court found it "likely that this accident might have occurred" even if the cook had not been commissioned, the sheriff's conduct was found to be a cause-in-fact of the shooting because it had "appreciably enhanced the chance of the accident occurring." Id. at 1052.
In the present case, E. Wilson Purdy, former Chief of Police for Dade County, Florida, for thirteen years, testified as an expert in proper police procedures and arrest techniques. He stated that because the reactions of an armed suspect are always unpredictable he could not say with certainty that the shooting could have been avoided. It was his opinion, however, the officers' attempt to "sneak up" on an apparently sleeping man greatly increased the likelihood that they would have to shoot since the subject would be expected to be startled into movement. Additionally, they approached through an open area with nothing between themselves and the "armed" man, increasing their awareness of vulnerability. If the officers had pulled their patrol car closer to Mr. Mathieu, shining the headlights on him and remaining behind the doors, then even if he'd been startled he would be less likely to point his gun and fire, and the officers would be less likely to feel threatened into shooting. Mr. Purdy also thought that under these circumstances, waiting for the arrival of back-up police and seeking more information from the nursing home employees and Mr. Tanner would have improved the chance to avoid gunfire.
Robert Lindsey, a 21-year police veteran, testified as an expert in officer survival tactics. He said there was no violation of police procedures by Officers Asaro and Guggenheim. In his opinion, the urgency of disarming Mr. Mathieu before he could escape into the nearby housing project weighed against the alternatives suggested by Mr. Purdy. Even if the officers had remained behind their car doors, which would not provide complete protection, they would have been justified in shooting if they saw the gun being raised in their direction. In his view, only Mr. Mathieu could have prevented the incident by lying still and permitting the police to take his gun.
A trial court's finding of fault and causation are essentially factual, subject to the manifest error standard of review. Rosell v. Esco, 549 So.2d 840 (La.1989). The same standard applies when such findings are based on expert testimony, unless the expert's reasons are unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). This Court finds no manifest error in the trial court's acceptance of Mr. Purdy's opinion over that of Mr. Lindsey. Since the testimony establishes that the police actions "appreciably enhanced the chance" that the officers would feel compelled to shoot, that conduct was a cause-in-fact of Mr. Mathieu's injuries.
The City also questions the trial court's conclusion that the officers breached their duty of reasonable care, citing alleged misstatements of testimony in the court's written reasons for judgment. We have reviewed the entire record and find that the substance of the reasons, both written and oral, is fully supported by a proper evaluation of the evidence.
Police officers have a duty to act reasonably in effecting an arrest, and the force used must be limited to that required under the totality of the circumstances. Kyle v. City of New Orleans, 353 So.2d 969 (La.1977). The control and use of firearms imposes a concomitant duty of extraordinary care. Webb v. Smith, 555 So.2d 556 (La.App. 4th Cir.1989). These principles establish an officer's duty to avoid creating a situation in which gunfire, otherwise avoidable, will be necessary. Recognition of such a duty is in the New Orleans Police Department's Operations Manual on the use of deadly force:

*380 An officer should exercise extreme caution with respect to use of deadly force. In all cases, only the minimum degree of force which is necessary shall be used, and every other available alternative shall be exhausted before deadly force is applied. FSOP 1.0, paragraph 5 (emphasis added).
Under the totality of the circumstances, Officers Asaro and Guggenheim breached that duty. Their approach in dim light through an open area with no available cover or back-up, towards a man believed to be armed, allowed no alternative to the use of deadly force if the subject made any movement.
We find no error in the imposition of vicarious liability on the City for officer negligence.

GOVERNMENTAL IMMUNITY
The City submits that police officers must exercise discretion in the performance of their duties and because a permissible policy judgment was made in this case, the City is immune from liability under La. R.S. 9:2798.1(B):
Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
This discretionary function exception to governmental liability applies only when a policy judgment is made at the ministerial level, not at the operational level. Fowler v. Roberts, 556 So.2d 1 (La.1989), on rehearing, 556 So.2d 13, 15 (La.1990). The distinction between the two was recently demonstrated in Kniepp v. City of Shreveport, 609 So.2d 1163 (La.App.2d Cir.1992), writ denied, 613 So.2d 976 (La.1993), where owners of property damaged in a riot asserted that police conduct caused their losses. The Court found that the police chief's order to withdraw from the area of the disturbance, leaving the plaintiffs' stores exposed to damage by rioters, was a discretionary policy choice to protect life over property. Therefore, R.S. 9:2798.1(B) applied to shield the City from liability. No immunity was found, however, for the acts of the patrolmen who were first on the scene and whose conduct allegedly angered bystanders and led to the riot. Their decisions were operational, not based upon a balancing of social policy.
The decisions of Officers Guggenheim and Asaro concerning their course of action were operational in nature. Although involving discretion, consideration of policy issues was not an element of their choices. Therefore, R.S. 9:2798.1(B) does not immunize the City from liability.

COMPARATIVE FAULT
The City claims that the trial court erred by failing to assign any fault to Mr. Mathieu and by apportioning only 20% to the toy gun manufacturer. In their answer to the appeal the Mathieus assert that there should be no reduction because the City failed to carry its burden of proof.
We find no merit to the City's assertion that Mr. Mathieu should be found partially at fault because he did not take medication and "did not act as a reasonably prudent paranoid schizophrenic." Although a psychiatrist, Dr. Kenneth A. Ritter, testified that certain drugs can prevent a schizophrenic's psychotic state, he also stated that the denial of a mental condition by a patient who refuses to accept treatment or medication is a symptom of the illness. The evidence clearly establishes that Mr. Mathieu was delusional and unable to distinguish right from wrong at the time of this incident, therefore legal fault on his part was not established. Fields v. Senior Citizens Center, Inc., 528 So.2d 573 (La.App.2d Cir.1988).
The Mathieus argue that there is no proof that Imperial Toy Company had manufactured the gun or that the gun was an unreasonably dangerous product.
Our comparative fault scheme requires allocation of fault to all culpable actors, party or not. Perez v. State, DOTD, 578 So.2d 1199 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991). It is not essential that the identity of the toy manufacturer be proven here; similar to a phantom driver in a vehicular accident case, the question *381 is whether it was shown that the conduct of another constitutes legal fault and caused Mr. Mathieu's injuries. See, e.g., Perez, supra at 1205; Brock v. Winn Dixie Louisiana, Inc., 617 So.2d 1234 (La.App. 3d Cir.), writ denied, 620 So.2d 848 (La.1993).
The trial court found that the design of the toy, i.e., its realistic appearance, made it unreasonably dangerous. The gun was not produced at trial, but a photograph is in evidence. Both experts, veteran policemen, viewed the photo and said that the gun appeared to be real. Mr. Lindsey said he'd identify it as a Beretta 9-millimeter semiautomatic handgun. Mr. Purdy testified that if that toy had been pulled on him in broad daylight he'd have responded by pulling his gun.
Although Mr. Tanner stated he had seen Mr. Mathieu earlier that day with a toy gun, no testimony was elicited as to why he considered it a toy. Testimony showed that a week or so before the shooting the New Orleans police had been involved in another incident where the subject's gun was a toy.
Under Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 115 (La.1986), a product can be found unreasonably dangerous in design if:
(1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product.... (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences.[1]
The production of a toy that duplicates a dangerous weapon might serve the same purpose as another toy, but the testimony establishes that the realistic appearance of this toy gun presented a substantial risk of harm. However, there is no corresponding benefit derived from the increased realism. Although this toy is not "unreasonably dangerous per se," it is reasonable to conclude that an alternative design would serve the same needs yet significantly lessen the risk of harm. Therefore, legal fault is properly apportioned to the toy manufacturer.
The City claims that under the five enumerated factors in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985), the toy manufacturer should bear a greater percentage of fault than the officers, rather than the twenty percent assigned by the trial court. However, apportionment of fault under Watson requires consideration of the extent of the causal relationship between each actor's conduct and the harm caused as well as the nature of the conduct as measured by the five factors. Blair v. Tynes, 621 So.2d 591, 599 (La.1993). In this instance, the officers' conduct was a direct cause of the shooting while the manufacture of a realistic toy gun was an indirect, but contributing cause. We find no error in the trial court's assignment of fault.

FUTURE MEDICAL EXPENSES
The City asserts that the award of $3,749,142.60 for future medical expenses is excessive because the wrong life expectancy figure was used and it includes psychiatric treatment necessary whether or not Mr. Mathieu had been shot.
We find no manifest error in the estimation of twenty-seven years for Mr. Mathieu's life expectancy, a factual finding. Dr. Robert B. Halvorsen, an expert in physical medicine and rehabilitation who prepared a life care plan for plaintiff, estimated Mr. Mathieu's life expectancy to be thirty to forty years. Dr. Samuel Perry, the plastic and reconstructive surgeon who treated Mr. Mathieu's pressure sores, said that he would estimate life expectancy as twenty-five years with optimal care, but only ten to fifteen years otherwise. An economist, Dr. Melville Wolfson, testified that because Mr. Mathieu was born in 1951 his life expectancy would be *382 thirty years. With this variation we cannot say the trial court erred by adopting twenty-seven years life expectancy.
The City contends that because the economist's figure used to calculate future medical expenses included an estimated $1,500.00 per year for psychiatric expenses, in addition to $10,400.00 per year for psychological counseling, Mr. Mathieu is recovering damages for his pre-existing mental condition.
A tortfeasor takes his victim as he finds him and must compensate the victim for all losses he has caused, including any aggravation of a pre-existing condition. Miley v. Landry, 582 So.2d 833 (La.1991). The evidence shows that Mr. Mathieu's mental condition was aggravated by the accident.
Dr. Halvorsen stated that outpatient psychiatric care as well as psychological counseling was included in his estimates because the depression and stress caused by Mr. Mathieu's paralysis interacted to such an extent with his schizophrenia. The depression makes it harder to control his psychotic episodes, while the schizophrenic condition increases his hostility and consequent noncompliance with treatment, which leads to further physical deterioration. Dr. Halvorsen described this course as a downward spiral, demonstrated by Mr. Mathieu's repeated infections and pressure sores.
Dr. Halvorsen was unable to apportion the estimated psychiatric expenses between the depression and the schizophrenia, but he agreed that treatment of the latter was more costly. He testified that inpatient psychiatric hospitalization, at an approximate cost of $15,000 per stay, had been required several times to control Mr. Mathieu's schizophrenia since the life care plan was prepared, but the estimate of $11,900.00 per year would not cover such hospitalizations.
The testimony thus supports the trial court's inclusion of both psychiatric and psychological treatment in future medical expenses. It was established that this accident aggravated Mr. Mathieu's pre-existing mental condition and that condition makes treatment of the physical effects of the shooting more difficult. Further, the evidence shows the amount awarded does not cover full psychiatric care for schizophrenia, but only a limited portion. This assignment has no merit.

AREATHA MATHIEU'S LOSS OF CONSORTIUM
The City complains that $127,000 for Ms. Mathieu's loss of consortium is excessive because she had not lived with her father since she was six years old and thus had a limited relationship with him.
An award of general damages, such as for loss of consortium, is within the great discretion of the factfinder. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993). Before such an award may be disturbed it must be found that the amount "is so high as to shock the conscience of the reviewing court" after consideration of the particular facts and circumstances of the case. In re Medical Review Panel of Bilello, 621 So.2d 6 (La.App. 4th Cir.1993).
The testimony shows that even after her parents separated, Ms. Mathieu usually saw her father at least once a week and that he phoned her often. Although she'd heard from other family members about Mr. Mathieu's strange behavior, Ms. Mathieu said he had shown her normal fatherly love, affection and companionship. After the shooting Mr. Mathieu became hostile and abusive towards others, though less so with his daughter. Ms. Mathieu was sometimes called upon to care for her father physically because he often refused to cooperate with nurses, therapists and other medical personnel. Thus, in late teen years the daughter had to become a caregiver for her father, and the change in their relationship is permanent.
Under these facts the award for Ms. Mathieu's past and future loss of consortium is not excessive.

GENERAL DAMAGES
Because the "cap" on general damage awards against political subdivisions, La.R.S. 13:5106(B)(1), has been held unconstitutional, Chamberlain v. State, DOTD, 624 So.2d 874 (La.1993), and the City does not challenge *383 this award on any other basis, we pretermit discussion of that assignment.
AFFIRMED.
GULOTTA, J. Pro Tem., concurs.
KLEES, J., dissents.
James C. GULOTTA, Judge Pro Tem., concurring.
I concur with that part of the majority opinion holding the City liable because of the dereliction of the police officers in the instant case. I concur also with the majority's evaluation of the medical evidence and the affirmance of the quantum award; however, I find difficulty in not assigning a percentage of fault to the victim.
As pointed out by the City it was the victim who was creeping around the nursing home at night, peeping into windows while armed with a realistic appearing toy gun. It was the victim also who, when confronted by police, pointed the gun at the police officers, thereby to some extent bringing about his own injury. While not excusing the actions of the police officers, I have concern about the lack of assignment of some percentage of fault to plaintiff.
Although I appreciate the fact that plaintiff was a paranoid schizophrenic, nonetheless his action, despite his mental disability, brought about (to some extent) his injury. Were it not for that line of cases represented by Fields v. Senior Citizen Center, Inc., 528 So.2d 573 (La.App. 2nd Cir.1988); Oliver v. Capitano, 405 So.2d 1102 (La.App. 4th Cir. 1981), writs den. 407 So.2d 731 and 734 (La. 1981); Garner v. Crawford, 288 So.2d 886 (La.App. 1st Cir.1974); and LaCava v. City of New Orleans, 159 So.2d 362 (La.App. 4th Cir.1964), which indicate that because of the infirmity caused by old age or mental disability a party cannot be held contributorily or comparatively negligent, I would be inclined to hold Gerard A. Mathieu comparatively negligent to the extent of 30 percent.
Nonetheless, I feel compelled to concur with the result.
KLEES, Judge, dissenting.
I would reverse the trial court's judgment. In view of the evidence, I find clear error in the trial court's finding that the actions of the police officers were negligent and that their conduct was a cause-in-fact of the harm. With regard to negligence, the trial judge in his Reasons for Judgment indicated that he based his finding upon the testimony of Mr. Tanner and upon the court's own evaluation of the two opposing experts on police procedure. However, the trial judge materially misrepresents Mr. Tanner's testimony when he states in his Reasons that Mr. Tanner "never heard the officers say anything" as they approached Mr. Mathieu. The actual testimony of Mr. Tanner was that the police officer who was driving exited his vehicle and was running over to position himself, when "he stumbled and fell and hollered `police'." This testimony correlates with that of the two officers, who also stated that they identified themselves as police. The trial judge's mistaken impression of Mr. Tanner's testimony constitutes manifest error when one considers that the officers' identifying themselves completely negates the plaintiffs' theory that it was negligent to sneak up on or "surprise" the suspect.
Moreover, I also find manifest error in the trial court's conclusion as to causation. The trial judge found that the officers' stealth approach made injury to Mr. Mathieu inevitable because he could not drop his gun in a prone position. This view ignores the obvious, that Mr. Mathieu could have remained asleep, could have awakened and remained still or called out that it was a toy gun, or could have gotten up and left the gun on the ground. Given this wide range of possibilities, I find it impossible to conclude that the officers' conduct was a "substantial factor" in bringing about the harm. See Ducote v. Jackson, 542 So.2d 689, 690 (La.App. 4th Cir.1989).
Under the circumstances, when every expert agreed that these officers were justified in firing once a realistically looking toy gun was pointed at them, I cannot hold that their conduct was either negligent or was a cause-in-fact *384 of the harm to the plaintiff. Therefore I respectfully dissent.
NOTES
[1] Since this incident occurred prior to September 1, 1988 the Louisiana Products Liability Act, R.S. 9:2800.51 et seq., does not apply. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La. 1991).